**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Douglas Ellis JOHNSON,
Defendant-Appellant.**

No. 79–1358.

United States Court of Appeals,
Ninth Circuit.

July 14, 1980.

As Amended on Denial of Rehearing and Rehearing En Banc Jan. 7, 1981.

Michael D. Stein, San Diego, Cal., for defendant-appellant.

Bruce R. Castetter, Asst. U. S. Atty., Michael H. Walsh, U. S. Atty., San Diego, Cal., for plaintiff-appellee.

Before CHOY, ANDERSON and PREGERSON, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

Johnson appeals his conviction on one count of conspiracy to possess a controlled substance, in violation of 21 U.S.C. § 846, and on one count of possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The sole error which Johnson raises on appeal is the trial court's denial of his motion to suppress certain items seized at his home. We affirm.

## I. BACKGROUND

On September 13, 1978, Special Agent Terry Lucchesi, a San Diego police officer who was assigned to the San Diego Narcot-

ic Task Force, contacted Assistant United States Attorney Stephen Peterson and asked permission to obtain a federal search warrant to search a residence located at 2405 Old Colony Road, Vista, California. Mr. Peterson then contacted United States Magistrate Edward A. Infante to request a telephonic search warrant. Magistrate Infante asked Mr. Peterson where he could get in touch with Agent Lucchesi, and then called Agent Lucchesi at a public telephone.

Agent Lucchesi recited the facts which he felt gave rise to probable cause to search the residence, and was sworn immediately after giving the oral affidavit. Agent Lucchesi filled out the duplicate original warrant and signed Magistrate Infante's name, as instructed. The house described in the warrant was the residence of Johnson.

We set out Agent Lucchesi's oral affidavit in its entirety in the margin.[1] The

1. The affidavit, transcribed verbatim from Agent Lucchesi's conversation with the magistrate, reads as follows:

"MR. LUCCHESI: I have a [sic] informant that is communicating with a female named Candy Bates who used to reside in Bellflower, California. This informant met with her on the evening of 9/2/78 at her residence in Bellflower, and the address is 10431A East Hayford, Bellflower, California. During that meeting Candy Bates informed the informant that she could deliver two pounds of cocaine through her connection Sue. This Sue was later identified as Linda Sue Spiking, S-p-i-k-i-n-g. Bates further told the informant that she has seen (referring to Bates) has seen approximately five pounds of cocaine at one time in the safe of Spiking recently at the residence of Spiking, and that residence was somewhere in the area of San Juan Capistrano. It wasn't specific as to the locale, just the area San Juan Capistrano. Bates projected that the delivery would be perhaps as early as September 6, 1978 and Bates told the informant to call her when he had the money together for the buy. There was another meeting the next night, September 3, 1978, again at the residence of Bates. Present were Bates, the C.I., and Spiking. During this meeting the informant saw what he thought to be two one ounce packages of cocaine on the dresser in the bedroom. There was a lot of conversation about the availability of the cocaine by Sue and her capability of delivering the two pounds of cocaine. She gave the informant a one half gram sample so that the informant could take that sample to the buyer to show the buyer the quality of the cocaine. Before leaving the residence Spiking told the informant that she was going to go to Palm Springs for the weekend and that the informant should go through Bates and that she would be able to facilitate the delivery of the cocaine. Then we have another meeting on September 11, 1978, at the informant's residence which is located at 21 East F Street in Encinitas, California. The undercover agent met with the informant, anticipating to purchase one ounce of cocaine from Bates. Bates arrived at the residence, discussed the transaction with the buyer; she then left the residence under surveillance; she went to a Bob's Big Boy which is on Encinitas Blvd. in Encinitas. She met with Spiking. After a short period of time another couple arrived, and they also met with Spiking and Bates. After a short conversation Bates and Spiking got up out of the booth with their purses; they went to the women's restroom; they returned; a short time later Bates and this unidentified couple left the restaurant in the unidentified couple's car. They went a short distance away on a residential street, parked. The dome light of the vehicle came on. It appeared, or we surmised that there was a [sic] exchange of narcotics. Bates then went back, got into her vehicle, and went to the buyer. The sale was consummated; the buyer bought one ounce of cocaine for $1900.00. There was conversation about another sale in the future, and then Bates drove to the location of Spiking who was waiting at the Big Boy's Restaurant and again we assumed that there was a money transfer. Then Spiking was followed from the restaurant almost to her residence in Vista, however, just prior to her being arrested the units terminated the surveillance because she was perhaps trying to see if she was being surveilled. O.K. that leads us up to today, 9/13/78. The confidential informant and Bates were at the residence of the informant and unannounced the undercover buyer went in. This was done because Bates said she did not want to meet or talk to the buyer again. He did communicate with her. They had a discussion about the previous ounce, that it was a poor quality. The buyer indicated that he would like a lower price, then he would buy the two pounds. There was a lot of discussion. Candy, or Bates made several calls from the telephone within the residence of the informant. The undercover agent overheard these calls and at one call Bates said: Doug, is Sue there? And then other times the informant heard the word Sue used by Bates on the telephone. It seemed like Bates was getting all her directions from

pertinent facts may be summarized as follows: Agent Lucchesi had been in contact with an unnamed confidential informant who had spoken with a person named Candy Bates. On September 2, the informant had gone to Bates' Bellflower, California, residence, where she had told the informant that two pounds of cocaine could be obtained from Linda Sue Spiking. According to Bates, Spiking lived somewhere near San Juan Capistrano, and had kept as many as five pounds of cocaine in a safe at her residence. The next evening, the informant met with Bates and Spiking again at Bates' Bellflower residence, where the informant observed what appeared to be two one-ounce packages of cocaine on her dresser. During that meeting, Spiking gave the informant a sample of cocaine, and told him to go through Bates for any immediate purchases. On September 11, the informant, accompanied by an undercover agent posing as a buyer, met with Bates at the informant's residence and discussed the proposed transaction. Bates then left the informant's residence under surveillance and met with Spiking and an unidentified couple at a restaurant. After a short conversation, Bates and Spiking took their purses and went to the women's restroom. After they returned to the booth, they and the unidentified couple left the restaurant and entered a car. The car drove a short distance, parked, and surveilling agents saw the dome light come on. The agents "surmised" that a drug transaction took place. Bates returned to the informant's residence with one ounce of cocaine, which the undercover agent purchased. Spiking was followed by agents to her residence in Vista. On September 13, the informant again met with Bates at the informant's residence. The undercover agent arrived, and attempt-ed to negotiate further for two ounces. Bates made several telephone calls, including one in which she asked, "Doug, is Sue there?" Negotiations between the agent-buyer and Bates finally broke off. Independent surveillance of Spiking's residence at 2405 Old Colony Road in Vista established that Spiking's car had been parked in the driveway at the time that Bates was making the telephone calls. Johnson's car was also parked at the Vista residence at the same time. Johnson was apparently residing with Spiking at the time.

The subsequent search of the Vista residence uncovered cocaine and various pieces of drug paraphernalia. Both Johnson and Spiking were convicted following a bench trial on stipulated facts.

## II. ISSUES ON APPEAL

Johnson argues on appeal that the warrant authorizing the search of the 2405 Old Colony Road residence was defective in two respects:

(1) The circumstances of the issuance of the warrant violated Fed.R.Crim.P. 41;

(2) The affidavit did not establish probable cause to search the residence.

## III. RULE 41 VIOLATIONS

Fed.R.Crim.P. 41 outlines the procedure to be followed in the issuance and execution of federal search warrants. Johnson argues in essence that Rule 41 was twice violated in this case. The first alleged error arose when Agent Lucchesi, a state officer, was allowed to apply for the warrant. The second occurred when the magistrate did not administer an oath to Agent Lucchesi until after he had given the oral affidavit.

Spiking on how to conduct the transaction. Finally it was communicated to Candy that there was no way they could do the deal unless the buyer fronted his money for the cocaine, and that's the summation of it. The address at 2405 Old Colony Road, Spiking's driver's license information indicates that that's her residence as of 6/21/78. Spiking's car was at the residence when Bates was talking to her on the phone at the residence of the informant which was overheard by the undercover buyer. Also, the informant obtained information that Doug was a boyfriend of Spiking. Surveillance on the house on Old Colony Road, we observed a black cadillac parked in the driveway. The registration was to a Douglas Johnson. That's just about it, I believe."

■ Rule 41(a) specifies that a search warrant may be issued "upon request of a federal law enforcement officer or an attorney for the government." Johnson contends that Agent Lucchesi was not a person authorized to "request" a warrant under Rule 41. The government does not contend that Agent Lucchesi's status as a member of the San Diego Narcotics Task Force, a joint force composed of Drug Enforcement Administration agents and members of San Diego's local police department, conferred upon him the status of a "federal law enforcement officer." Therefore, if we find that Agent Lucchesi was, as a matter of law, the person who "requested" the warrant, then we must find that Rule 41 was violated.

We are not persuaded, however, that Agent Lucchesi was the "requestor" in this instance. According to the affidavit of Assistant United States Attorney Peterson, it was he who made the initial telephone call to Magistrate Infante to request the warrant. Magistrate Infante declined to allow him to participate in the conversation with Agent Lucchesi. Rule 41 sanctions a procedure under which a witness other than the requestor may supply the facts necessary to satisfy the probable cause requirement. *See Notes of Advisory Committee on Rules, 1977 Amendment.*[2] In this case, we find that even though Agent Lucchesi supplied the oral probable cause affidavit, the warrant was requested by Mr. Peterson. The trial judge so found and we agree.

■ A finding that Mr. Peterson requested the warrant, however, does not end our inquiry. As Johnson rightly points out, to find that Mr. Peterson "requested" the warrant is to find that a number of other violations of Rule 41 occurred. Rule 41(c)(2)(B) provides that "[t]he person who is requesting the warrant shall prepare a document to be known as a duplicate original warrant and shall read such duplicate original warrant, verbatim, to the Federal magistrate." In this case, it was Agent Lucchesi who prepared and read the duplicate original, and not Mr. Peterson. Rule 41(c)(2)(C) provides that, upon determining that grounds to issue the warrant exist, the federal magistrate shall then direct the person requesting the warrant to sign the magistrate's name on the duplicate original warrant. Again, it was Agent Lucchesi who signed the duplicate original, and not the requestor, Mr. Peterson. Rule 41(c)(2)(D) requires that when a caller informs the magistrate that the purpose of the call is to request a telephone search warrant, the magistrate " . . . shall immediately place under oath such person whose testimony forms a basis of the application and each person applying for the warrant." Mr. Peterson was not placed under oath when he called to request the warrant. However, he was not a person giving testimony in support of the warrant. The failure to place Mr. Peterson under oath harmed no one and would have been a useless gesture. Rule 41(c)(2)(D) further requires that the magistrate record all of the call after the caller informs the magistrate that a search warrant is requested. The call from Mr. Peterson was not recorded, at least insofar as this record discloses.

In all, therefore, the procedure used here entailed no less than four technical violations of the telephonic search warrant procedure described by Rule 41(c)(2). We are not convinced, however, that these violations required suppression. A violation of Rule 41 is not "fundamental" unless it also involves a constitutional violation. See *United States v. Vasser,* 648 F.2d 507 (9th Cir. 1980). "Non-fundamental" noncompliance with Rule 41 requires suppression only if (1) there was "prejudice" in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of the Rule. *Vasser, supra; United States v. Radlick,* 581 F.2d 225, 228 (9th Cir. 1978).

---

2. "(2) The applicant must orally state facts sufficient to satisfy the probable cause requirement for the issuance of the search warrant. (See subdivision (c)(1)). This information may come from either the applicant federal law enforcement officer or the attorney for the government or a witness willing to make an oral statement."

In this case, no constitutional violation tainted the warrant. Consequently, we test the validity of the procedure under the standards for "non-fundamental" noncompliance. We conclude that suppression was not required.

At every step, the spirit of Rule 41 met with full compliance. A duplicate original was properly prepared, and signed by proxy as the Rule requires. A full account of the probable cause affidavit was recorded and preserved for later examination. Agent Lucchesi was sworn as a witness, albeit after the giving of the affidavit. *See infra.* There is nothing to indicate that the warrant would not have been issued had the magistrate insisted that the procedure fully comply with Rule 41. Mr. Peterson could certainly have filled out the duplicate original and signed it. The only differences of any substance between the Rule 41 procedure and that followed here would be that Agent Lucchesi's testimony should have been taken separately as that of a witness only, and the warrant should have been issued to Mr. Peterson. We find that the warrant would have been issued in any event.

There is absolutely no evidence indicating any bad faith or deliberate disregard of the Rule. From the government's perspective, there was little else that either Mr. Peterson or Agent Lucchesi could have done to comply with the rule. The record reflects a conscientious effort on the part of Agent Lucchesi to comply with the law in obtaining the warrant.

While we do not approve of deviations from any established procedure, and we do admonish both the courts and enforcement officers to comply with the letter of Rule 41, we are convinced that the law of our circuit does not mandate suppression on the basis of the violations cited above. *See also,* Rule 52(a), F.R.Cr.Pr.

**3.** Immediately following completion of Agent Lucchesi's recitation of the facts supporting probable cause, the following exchange took place:

## IV.  *ADMINISTRATION OF THE OATH*

As we noted earlier, Rule 41(c)(2)(D) requires that the magistrate "immediately" placed under oath each person whose testimony forms a basis of the application in the event of a request for a telephonic search warrant. Agent Lucchesi was not placed under oath until after he had completed giving the oral affidavit of probable cause.[3] Johnson argues that noncompliance with this provision of the Rule requires suppression.

In *United States v. Shorter,* 600 F.2d 585 (6th Cir. 1979), the Sixth Circuit adopted a principle which supports Johnson's position. The *Shorter* court reasoned that Congress intended to bring the oath requirement of the fourth amendment in line with modern day technology by requiring in Rule 41 that oaths be given in advance of oral probable cause affidavits. The court further reasoned that the purpose of the oath requirement, to impress upon the affiant the solemnity of the occasion and the need to tell the truth, required that it read rule 41(c)(2)(D) to speak "more of substance than procedure. . . ." 600 F.2d at 589. Accordingly, it held that the failure to place the affiant immediately under oath required suppression. *See also United States v. Turner,* 558 F.2d 46 (2d Cir. 1977).

■■■■ We do not agree with *Shorter,* and reach an opposite result. Under the test enunciated in *Radlick, supra,* we find that the failure to place Agent Lucchesi immediately under oath constitutes non-fundamental noncompliance with Rule 41 and does not require suppression. Agent Lucchesi undoubtedly would have given his testimony in substantially identical form had the oath been taken prior to the rendering of the oral affidavit. No prejudice resulted from the timing of the oath. Again, we do not condone noncompliance; we merely hold that this is not the magnitude of viola-

"MAGISTRATE: Very well. Do you swear that the testimony you have just given is the truth, the whole truth, and nothing but the truth?
"MR. LUCCHESI: Yes, I do."

tion which requires suppression.[4] Rule 52(a), F.R.Cr.Pr.

With respect to Parts III and IV, we emphasize that Johnson does not urge any violation of constitutional proportions. Nor does he urge that the search and the seizure would not have occurred or would have been less intrusive or abrasive if these technical violations of Rule 41 had not been present. All of the interests sought to be preserved by the Fourth Amendment and implemented by Rule 41 were preserved in this case for the protection of Johnson. Primary among these is the preservation of a record for subsequent judicial scrutiny. Even with the technical violations, the search and seizure was not "unreasonable" under Fourth Amendment standards. The transgressions of the rule do not in any degree touch upon guilt or innocence. We decline to extend the exclusionary rule under these circumstances. *United States v. Turner, supra,* at 52–53.

## V. *PROBABLE CAUSE*

Turning to the substance of Agent Lucchesi's affidavit, Johnson argues that the affidavit is defective in two respects. He claims first that the reliability of the confidential informant was not established in the affidavit, and secondly that the affidavit failed to establish probable cause to believe that cocaine was located at the Old Colony Road residence.

■ In reviewing the validity of an affidavit underlying a search warrant, we give "great deference" to the determination of the magistrate that probable cause existed. *See, e.g., United States v. Young Buffalo,* 591 F.2d 506 (9th Cir.), *cert. denied,* 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979); *United States v. Solario,* 577 F.2d 554 (9th Cir. 1978). We are also guided by the principle that an affidavit must be tested in a "commonsense and realistic fashion." *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965);

*see also, e.g., United States v. Carignan,* 600 F.2d 702 (9th Cir. 1979); *United States v. Dubrofsky,* 581 F.2d 208 (9th Cir. 1978).

■ In examining the reliability of a tip given by a confidential informant, the time-honored "two-pronged" *Aguilar-Spinelli* analysis applies. *See Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Under the *Aguilar-Spinelli* test, an affidavit containing information provided by an unnamed informant must: (1) provide information showing the reliability of the informant's information, and (2) provide information indicating the informant's credibility. *See, e.g., United States v. Beusch,* 596 F.2d 871, 874 (9th Cir. 1979).

■ It is the second prong of *Aguilar-Spinelli* which troubles Johnson. The affidavit contains no indication that the informant has proven to be reliable in the past. It simply lays out the informant's observations. An informant's reliability may be established by independent investigation which tends to corroborate the details of the informant's tip. *See, e.g., United States v. Moreno,* 569 F.2d 1049 (9th Cir.), *cert. denied,* 435 U.S. 972, 98 S.Ct. 1615, 56 L.Ed.2d 64 (1978); *United States v. Fluker,* 543 F.2d 709 (9th Cir. 1976); *United States v. Prueitt,* 540 F.2d 995 (9th Cir. 1976), *cert. denied sub nom. Peterson v. United States,* 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780 (1977).

■ According to the affidavit, the confidential informant in this case provided essentially two key pieces of information: (1) that Candy Bates had represented that she could obtain cocaine for the informant's buyer, and (2) that Sue Spiking, who lived "somewhere in the area of San Juan Capistrano," was her source. The informant also provided Bates' uncorroborated observation of several pounds of cocaine in Spiking's safe. Independent observations of govern-

---

4. Johnson has also raised as a ground for suppression that the oral affidavit was insufficient to establish exigent circumstances justifying a telephonic warrant. Rule 41(c)(2)(G) makes clear that this is not a ground for suppression in the absence of a showing of bad faith. No bad faith is shown by the record.

ment agents clearly corroborated Bates' willingness to supply cocaine. The undercover agent purchased one ounce from her. Spiking's role as the supplier also was reasonably corroborated. Bates met with Spiking at the restaurant on September 11 and returned with the ounce which was sold to the undercover agent. The agent also observed Bates on September 13 make a phone call to someone named "Sue" in order to negotiate for a cocaine purchase. The probability here clearly indicated that the informant's information that Spiking was supplying cocaine was correct. All of the other information in the affidavit was either observed directly by government agents or corroborated directly. The affidavit provided a "substantial basis" for crediting the informant's hearsay declarations. *See United States v. Harris*, 403 U.S. 573, 581, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

■ Johnson also points to a lack of hard information placing cocaine at the Old Colony Road residence. Aside from Bates' assertion, there is nothing in the affidavit to indicate that any other person had actually observed contraband at the house. Such a direct observation is unnecessary, however. It is only necessary that the affidavit enable the magistrate to conclude that it would be reasonable to seek the evidence in the place indicated by the affidavit. *United States v. Hendershot*, 614 F.2d 648, 654 (9th Cir. 1980). The nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would likely hide contraband. *See United States v. Dubrofsky, supra*, at 212. Drug dealers frequently hide contraband at their residences. *Id.*

[11] In the present case, the affidavit provided a basis for the magistrate to conclude that it would be reasonable to search for cocaine at the Old Colony Road residence. Linda Sue Spiking had been identified as a cocaine dealer. Her driver's license had established that she resided at 2405 Old Colony Road. Surveillance of the house at that address had established that Spiking's car was parked there during Bates' telephone negotiations on September 13. It was entirely reasonable to search the residence described in the warrant for cocaine.

## VI. CONCLUSION

The judgment of the court below is AFFIRMED.[5]

PREGERSON, Circuit Judge, dissenting.

I dissent for the same reasons expressed in my dissent in *United States v. Vasser*, 648 F.2d 507 (9th Cir. 1980). See also *United States v. Shorter*, 600 F.2d 585 (6th Cir. 1979).

---

5. This opinion does not conflict with this court's opinion in *United States v. Soto-Soto*, 598 F.2d 545 (9th Cir. 1979). In *Soto-Soto*, it was necessarily found that a violation occurred because a border search not conducted by a customs or immigration officer is, by definition, "unreasonable." The FBI agent conducting the search in *Soto-Soto* had no statutory authority to make the border search.