J-S95023-16

2017 PA Super 408

COMMONWEALTH OF PENNSYLVANIA     IN THE SUPERIOR COURT OF
                PENNSYLVANIA

           Appellee

           v.

ERIC TORRES

           Appellant            No. 2241 EDA 2015

Appeal from the Judgment of Sentence Entered July 8, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at Nos: CP-51-CR-0011169-2013
CP-51-CR-0011170-2013
CP-51-CR-0011171-2013
CP-51-CR-0011172-2013
CP-51-CR-0011173-2013

BEFORE: STABILE, MOULTON, and MUSMANNO, JJ.

OPINION BY STABILE, J.:            **FILED DECEMBER 22, 2017**

Appellant, Eric Torres, appeals from the July 8, 2015 judgment of sentence imposing an aggregate term of 66 to 132 years' imprisonment for assault of law enforcement officer, aggravated assault, simple assault, persons not to possess firearms, firearms not to be carried without a license, carrying firearms on public streets in Philadelphia, possessing instruments of crime ("PIC"), possession of a controlled substance with intent to deliver

("PWID"), and possession of drug paraphernalia.[1] We vacate and remand for a new trial.

The trial court set forth the following facts:

> On August 13, 2013, Officer William Barr of the Philadelphia Police Department was assigned to street patrol in a marked vehicle in the area of Fifth Street and Allegheny Avenue. Just before noon, Officer Barr initiated a traffic stop on a BMW, Pennsylvania license plate number JJA-951, travelling eastbound on Allegheny. Officer Barr had been traveling behind the vehicle and initiated the stop when he saw the middle brake light was not functioning. The vehicle pulled over on Fifth Street, just North of Allegheny. Officer Barr exited his patrol car and approached the vehicle, which was being driven by Appellant. As he approached, he noticed Appellant' shoulders moving back and forth.
>
> Officer Barr explained that he had stopped Appellant for the brake light, as well as his inspection stickers, which were from New York but placed on a Pennsylvania license plate. He asked for Appellant's license and registration. Officer Barr testified that Appellant produced the documents right away, but that he appeared nervous and was looking around. Officer Barr asked Appellant if there was anything in the vehicle he should know about, but Appellant did not answer. This made Officer Barr concerned for his safety, and he opened the door and asked Appellant to step out of the vehicle. Appellant did not exit the vehicle; instead he closed the door and drove away. Officer Barr returned to his own vehicle to follow him. He still had Appellant's license and registration in his hand at this time.
>
> Officer Barr followed Appellant on Fifth Street for about five or six blocks. Officer Barr relayed information about Appellant's flight over the radio. Sergeant Zimmerman[2] then

_____

[1] 18 Pa.C.S.A. §§ 2702.1(a), 2702(a), 2701(a), 6105(a)(1), 6106(a)(1), 6108, and 907(a) and 35 P.S. §§780-113(a)(30) and 780-113(a)(32), respectively.

[2] Sergeant Zimmerman's first name is not in the record.

directed Officer Barr to terminate his pursuit due to safety concerns, as both vehicles were traveling at high speeds in a residential area. Within a few minutes, Sergeant Zimmerman met Officer Barr at Fifth and Sedgley Avenue to sign his log. At about this time, Officer Barr also received information over the radio about a crash and a disturbance at a grocery store at Fourth and Annsbury Streets. Officer Barr then traveled to the grocery store.

Officer Roberto Luciano was also on duty in the same neighborhood on August 13 and received the call about a vehicle that had fled a stop. Officer Luciano traveled to Second and Erie to attempt to intercept the vehicle. While waiting at that intersection, a 911 call reported a similar vehicle involved in an accident at Second and Bristol streets. Upon arriving at the scene, Officer Luciano observed a light-colored BMW crashed against a fence and building. The building was owned by the Richard Burns Company, a construction material recycling facility. Allen Burns, the owner of the company, was in the parking lot when he heard a screeching and "bang" of the car hitting the building. Mr. Burns saw the man in the driver's seat, later identified as Appellant, push the airbag away and climb out of the driver's side window. Mr. Burns watched Appellant take a step or two, then turn back and reach inside the vehicle. He then began running from the car as he was putting something dark in his pocket. When Officer Luciano arrived on the scene soon after, he reported over the radio that the vehicle was unattended, and the driver had fled.

Upon hearing the information broadcast by Officer Barr, Officers [Craig] Van Sciver and Raul Ortiz drove to 401 West Raymond Street to see if Appellant returned to his residence. While waiting outside the residence, they received more information from Officer Luciano regarding the crash at Mr. Burns' building. Officers Van Sciver and Ortiz began traveling toward Third and Wingohocking Streets, hoping to intercept Appellant. Officer Van Sciver testified that they were then approached by an unidentified man, who told them a man had just run into the corner grocery store at Fourth and Annsbury Streets. Upon entering the store, they saw Appellant running down an aisle toward a back access door, and gave chase. Officer Van Sciver grabbed Appellant at the steps by the door, and testified that Appellant resisted and kept his hands at his waistband.

- 3 -

Officers John Bucceroni and Edward Davies were in a marked police car in the area of Fourth and Annsbury when they received the radio calls regarding Appellant that day. They arrived at the Almonte Grocery store within a few minutes of receiving the call. Officer Bucceroni testified that Officer Davies entered the store first. Officers Van Sciver and Ortiz were already on the scene, and Officer Bucceroni saw them struggling with Appellant at the back of the store. Appellant appeared to be on his knees or bending over, and both hands were at his waist. The officers were trying to hold Appellant's arms. They were instructing Appellant, in both English and Spanish, to show his hands.

Officer Bucceroni testified that as Appellant struggled, he and Officers Van Sciver, Davies, and Ortiz were all attempting to get him under control. They continued to say "dame los manos" and "give me your hands." Officer Bucceroni reached for Appellant's hands, and felt a metal object he recognized as the barrel of a gun. He said "gun" to alert his fellow officers, and a few seconds later a shot was fired. He heard Officer Davies react, but did not see him, because Appellant was still struggling.

Officer Shawntai Cooper had arrived on the scene with her partner, Officer Kendall Robinson, when the other four officers were already struggling with Appellant. In the course of the struggle, she saw a muzzle flash and heard a "pop" sound. Officer Davies said "I'm shot" and grabbed his abdomen. He stumbled towards Officer Cooper and fell into her arms. With the help of Officer Barr, Officer Cooper put Officer Davies into a car and drove him to Temple University hospital.

After Officer Davies was shot, Officer Bucceroni told Appellant to give him the gun, but Appellant continued to kick and struggle against the officers. When Officer Bucceroni grabbed for the gun again, Appellant bit his wrist. When he tried to pull the gun away a second time, Appellant bit him again and drew blood. Officer Bucceroni was eventually able to get the gun from Appellant and hand it to Officer Ortiz. Appellant continued to struggle, but officers were then able to handcuff him. They attempted to escort Appellant from the store, but he continued to resist. As the officers brought Appellant to a marked police car, he kicked, and attempted to bite and head-butt the officers.

Following his arrest, Officer Luciano requested Appellant be brought back to the scene of the accident, so that Mr. Burns could identify him as the man who fled from the car crash. Appellant was brought to the scene of the accident in a police vehicle, and Officer Luciano observed him screaming and banging his head on the Plexiglas divider and on the back of the seat. Appellant was saying that if the officers took the handcuffs off, he would fight with them. They removed Appellant from the vehicle, and he began swinging his arms trying to reach his waistband, with his hands still cuffed behind his back. Mr. Burns was able to positively identify Appellant as the man who had fled the scene of the accident on his property. Before returning Appellant to the vehicle, he was patted down in the waistband area he had been reaching for, and a black holster was found clipped to his belt.

Appellant was then taken to Einstein Medical Center's emergency department. Dr. Neeraj Gupta attempted to assess any injuries following the car accident and struggle with police, but Appellant was uncooperative. Several people were required to hold Appellant down on a stretcher, and eventually leg and arm restraints were deemed necessary. Even after applying restraints to Appellant, he continued to fight and was still able to sit up. Dr. Gupta became concerned about this behavior, which included biting and spitting, and administered a sedative to calm Appellant. After obtaining vital signs and as much other information as he could from Appellant, Dr. Gupta concluded that he appeared to be intoxicated, likely due to an illegal substance. Appellant was discharged from the hospital the next day, August 14.

Officer Edward Davies testified that he had been trying to help other officers restrain Appellant when he heard a bang. He said he felt his chest and stomach get "real hot" and saw a hole in his shirt. He testified that everything was hazy and he remembered staggering towards the floor. When Officer Cooper drove him to the hospital, he recalled her telling him to keep his eyes open and stay awake.

Officer Davies testified that he spent 37 days in the hospital, and was in a medically-induced coma for three weeks. It was several months before he was able to walk normally again. At the time of trial he had five surgeries to address his injuries, and was told he would need at least one more surgery

following trial. At the time of trial, Officer Davies was undergoing rehabilitation and aquatic therapy three times a week. He continued to feel constant pain in his stomach, back, groin, and right leg and foot. He testified that he was unable to lift or play with his three-year-old son due to his injuries. Officer Davies also lost a kidney due to the shooting.

Detective Frank Mullen, assigned to the Homicide Unit, assisted in obtaining video surveillance footage from the Beer Stop beer distributor located at 4245 Rising Sun Avenue. The distributor had multiple surveillance cameras on its property, and Detective Mullen was able to obtain footage from August 13 that showed the Richard Burns Company's property. The footage showed Appellant's BMW crash into the fence and building around noon.

Officer Brian Myers was assigned to the Narcotics Field Unit at the time of the incident. On August 13, 2013, he was sent to execute a search warrant at Appellant's home at 401 West Raymond Street. From the house, Officer Myers recovered a white rectangular object known as a rack of heroin, boxes of blue and white glassine baggies, and a grinder. Multiple packs of marijuana and bulk heroin were also found.

Officer Steven Berardi of the Crime Scene Unit was assigned to process two vehicles registered to Appellant at the police garage on McCallister Street on August 14, 2013. These vehicles were a silver BMW, license plate JJA9851, and a black Lexus, license plate JCT4539, both registered to Appellant. Officer Berardi photographed the exterior and interior of each vehicle, and these photographs were entered into evidence.

Inside the BMW was a Samsung phone with a black and red case on the passenger side floor. In the glove compartment were four empty "green plastic screw cap jars," which Officer Berardi testified are often used to package marijuana. There was also a bundle of blue glassine packets (approximately 12 packets) stamped "eBay," containing an off-white powder, later tested and determined to be heroin. Officer Berardi also found a fanny pack containing multiple bundles of white and blue glassine packets containing an off-white powder. In another pocket of the fanny pack were two more bundles of white glassine packets containing off-white powder. More white glassine packets were found inside a red sunglass pouch containing off-white powder, stamped "Lexus." In total, Officer

Berardi recovered 153 glassine packets containing off-white powder from the BMW; 22 blue packets stamped "eBay" and 131 white packets stamped "Lexus." No contraband was found inside the Lexus registered to Appellant.

Officer Kevin Keyes of the Narcotics Field Unit gave expert testimony at trial. Officer Keyes reviewed the chemical analysis of the property retrieved from Appellant's home and vehicles. Officer Keyes testified that in his expert opinion, the drugs found in this investigation were possessed with the intent to distribute. Officer Keyes based this determination on the amount of packets and the bulk amount of heroin possessed, which would amount to over 800 packets total based on his estimates. The grinder and strainer found in the house are also often used in processing kilos of heroin to a fine powder. Officer Keyes further explained that the toothbrush found with powder residue was commonly used to keep buildup off the grinder, and the cards and straw were used to portion out the powder into individual packets.

Trial Court Opinion, 4/22/16, at 2-9 (citations omitted).

On March 10, 2015, a jury convicted Appellant of the aforementioned offenses. On July 8, 2015, the trial court imposed sentence as set forth above. Appellant filed a post-sentence motion on July 13, 2015, which the trial court denied the next day. This timely appeal followed. Appellant raises four assertions of error:

1. Did not the trial court err in denying Appellant's motion to suppress the evidence seized pursuant to search warrant no. 176023, as the affidavit did not provide probable cause to believe that evidence would be found in the home as the completed crime took place inside of a grocery store far from that site?

2. Did not the trial court err in denying Appellant's motion to sever when a case involving possession of drugs and a blank gun found in a home was consolidated with an unrelated case alleging a shooting of a police officer in a grocery store as the evidence in the drugs and blank gun case was inadmissible in

the case alleging an assault on a police officer, and the error was prejudicial?

3. Did not the trial court err in imposing a twenty-year minimum mandatory sentence when the legislature did not specify if 42 Pa.C.S.A. § 9719.1's "mandatory term of imprisonment" was to be applied to the minimum or maximum sentence imposed (unlike other mandatory sentencing statutes) and the Pennsylvania Supreme Court in *Commonwealth v. Glover,* 156 A.2d 114 (Pa. 1959) held that a mandatory term of imprisonment must be applied to the maximum sentence in such a situation?

4. Did not the lower court err and abuse its discretion by sentencing [Appellant] to an unreasonable sentence that was higher than the standard range of the Sentencing Guidelines, (even with application of the deadly weapon enhancement) and 18 times what the guidelines recommend, without giving adequate reasons, on the basis of considerations, including the nature of the offense, his prior criminal history and the use of a deadly weapon, that were already factored into the Sentencing Guidelines and did not the lower court further err by failing to give proper consideration to [Appellant's] personal circumstances and mitigating factors?

Appellant's Brief at 5-6.

Appellant first argues that the affidavit in support of the search warrant for his home did not contain sufficient facts from which the issuing authority could find probable cause to search the home. He maintains that because both Appellant and the gun were recovered at the scene, there was not probable cause to believe that connecting evidence would be found at Appellant's home. We agree.

When reviewing a denial of a suppression motion, we must determine whether the record supports the suppression court's factual findings and whether the legal conclusions drawn from those facts are correct.

- 8 -

*Commonwealth v. Brown*, 64 A.3d 1101, 1104 (Pa. Super. 2013). In reviewing the record, we consider all of the Commonwealth's evidence, as well as uncontradicted defense evidence. *Commonwealth v. Harvard*, 64 A.3d 690, 695 (Pa. Super. 2013), *appeal denied*, 77 A.3d 636 (Pa. 2013). Where the record supports the suppression court's findings, they are binding on the appellate court. *Id.*

A search warrant must be supported by probable cause. U.S. Cont. amend. IV; Pa.Const. art. I, § 8. "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." *Commonwealth v. Jones*, 988 A.2d 649, 655 (Pa. 2010)[3] (quoting *Commonwealth v. Thomas*, 292 A.2d 352, 357 (Pa. 1972)).

Further:

> In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the United States Supreme Court

---

[3] Six Justices participated in *Jones*. Justice McCaffery wrote the majority opinion, joined by Justice Eakin. Chief Justice Castille, joined by Justice Baer wrote a concurring opinion in which he joined Justice McCaffery's opinion but expressed his own thoughts on the proper standard for reviewing a magistrate's probable cause determination. *Jones*, 988 A2d at 659-60 (Castille, C.J., concurring). Justice Todd, joined by then-Justice Saylor, now Chief Justice Saylor, authored a concurring opinion in which she agreed only with the majority's result that probable cause supported issuance of the warrant. *Id.* at 661-62 (Todd, J. Concurring). In summary, the *Jones* Court was unanimous as to the result but divided about the level of deference to be afforded to a magistrate's probable cause determination.

established the "totality of the circumstances" test for determining whether a request for a search warrant under the Fourth Amendment is supported by probable cause. In **Commonwealth v. Gray**, []503 A.2d 921 ([Pa.] 1986), this Court adopted the totality of the circumstances test for purposes of making and reviewing probable cause determinations under Article I, Section 8. In describing this test, we stated:

> Pursuant to the "totality of the circumstances" test set forth by the United States Supreme Court in **Gates**, the task of an issuing authority is simply to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place . . .. It is the duty of a court reviewing an issuing authority's probable cause determination to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common-sense, non-technical manner.
>
> . . .
>
> [Further,] a reviewing court [is] not to conduct a *de novo* review of the issuing authority's probable cause determination, but [is] simply to determine whether or not there is substantial evidence in the record supporting the decision to issue the warrant.

**Id.** (quoting **Commonwealth v. Torres**, 764 A.2d 532, 537–38, 540 (Pa. 2001)) (some alterations in original).

The affidavit of probable cause submitted to the issuing authority in support of a search warrant for Appellant's home stated in full:

> On 8-13-13 at 11:55AM Philadelphia Police Officer Barr #6345, in uniform and a marked police vehicle (RPC #2532), observed a BMW sedan, PA Reg #JJA-9851, with a rear brake light not illuminated traveling eastbound on Allegheny Ave. going towards 5th St. P/O Barr initiated a vehicle stop by activating

the lights and siren and the BMW turned left (N/B) onto N. 5th St. The vehicle stopped and P/O Barr approached the driver's side and observed a lone male (later ID'd as Eric Samuel Torres-Solivan DOB 10-26-81) in the driver's seat. The male was requested to supply his driver's license, registration and insurance paperwork, which he did. P/O Barr states that during his encounter with Torres-Solivan he acted erratic and it was at this time that Torres-Solivan was directed to exit the auto. Torres-Solivan opened the driver side door and then suddenly closed the door and sped away, northbound on N. 5th St. P/O Barr pursued the vehicle N/B on N. 5th St., supplied Police Radio with Flash information on the auto and the male as well as the direction of travel. P/O Barr was then directed by Sgt. Zimmerman to end the pursuit, which he did, at 5th & Lindley. P/O Barr awaited the arrival of Sgt. Zimmerman.

P/O Bucceroni #1248, in uniform and a marked vehicle (RPC #2541) along with his partner, P/O Edward Davies #1240, responded to 4th & Annsbury, at the Almonte corner grocery store, in reference to the investigation of a male, later ID'd as Eric Samuel Torres-Solivan DOB 10-26-81, who was observed by P/O's VanShiver and Ortiz inside the of the grocery store. Torres-Solivan was directed numerous times by the Officers to display his hands, but failed to do so. The Officers then attempted to subdue Torres-Solivan by tackling him and a struggle ensued. During this struggle Torres-Solivan was continually directed to cease resisting the officers and to show his hands, but continued to be noncompliant.

It was during this struggle that P/O Bucceroni had his arms wrapped around the waist area of Torres-Solivan and he felt a handgun. P/O Bucceroni was also being bitten on his hand by Torres-Solivan at the same time. P/O Bucceroni had his hand positioned on top of the receiver of the handgun and he felt and heard the gun discharge. P/O Davies then stumbled from the immediate area, holding his stomach, suffering from a gunshot wound. Torres-Solivan continued to resist and was eventually subdued and handcuffed and placed in the rear of a Police vehicle.

P/O Barr arrived at the Almonte grocery store, 4th & Annsbury, and observed that P/O Davies had sustained a gunshot wound to his stomach, and assisted him into an awaiting RPC. P/O Barr then observed Torres-Solivan resisting

the officers' efforts to handcuff him and he assisted in the arrest. P/O Barr positively identified this male, Torres-Solivan, as having been the male who was the operator of the BMW who fled on N. 5th St. from him. Once Torres-Solivan had been placed into the rear of an RPC, P/O Barr asked why he proceeded to flee, that he should have stopped. Torres-Solivan responded "I couldn't, I had a gun". P/O Barr then proceeded to Bristol & Rising Sun and positively ID's the BMW, PA Reg # JJA-9851, as having been the auto he had stopped that was being operated by Torres-Solivan.

The weapon recovered from Torres-Solivan is a .45 cal Glock model 30, Serial # LFH813, loaded with a magazine that contained seven (7) unfired cartridges and one (1) stove-piped casing in the handgun.

Torres-Solivan supplied his home address as being 401 W. Raymond St. Phila., PA 19140. The driver's license supplied by Torres-Solivan to PO Barr during the initial investigation also indicates the address of 401 W. Raymond St., with PA OLN - 29135376, issued on 7-03-13.

It is the belief of this Affiant that enough probable cause exists for issuance of a Search Warrant authorizing the search of 401 W. Raymond St. Phila., PA 19140, the residence of Eric Samuel Torres-Solivan 31/H/M. Items to be searched for are:

Specifically and all ammunition or ballistics evidence consistent with a .45 cal Glock model 30, as well as any and all handguns, rifles, shotguns, ammunition, gun storage boxes/containers, proof of identification, and any other items of evidentiary value.

Affidavit of Probable Cause #176023.

The trial court denied Appellant's motion to suppress the evidence,

reasoning:

The shooting of Officer Davies, which occurred mere blocks from Appellant's residence, involved an illegally obtained firearm. Based on this information, police applied for a search warrant of Appellant's residence. They sought to find further evidence linking this firearm to Appellant, such as ammunition, in their search. The search of the home led to significant evidence of a drug-dealing operation, which directly led to the

- 12 -

> search of the other vehicle, which was parked at the residence and also registered to Appellant.

Trial Court Opinion, 4/22/16, at 11.

Appellant argues that there was no nexus between the crimes under investigation and the search proposed in the warrant. We agree. For guidance on the nexus requirement as it relates to home searches, we turn to this Court's opinions in **Commonwealth v. Kline**, 335 A.2d 361 (Pa. Super. 1975), and **Commonwealth v. Way**, 492 A.2d 1151 (Pa. Super. 1985). In **Kline**, police obtained a warrant to search the defendant's home based on statements from two girls who stated that the defendant went home and retrieved LSD after the girls asked if they could buy some from him. The affidavit contained no evidentiary basis for the girls' statement that the defendant went home, and not to some other location, to retrieve the LSD. This Court framed the issue as follows: "What is before us is the question whether the informants supplied information sufficient to justify the inference, not only that criminal activity was afoot (their information was certainly sufficient for that), but also that the premises to be searched were instrumental in that activity." **Kline**, 335 A.2d at 363. Further, "the information [m]ust be sufficient . . . to enable the magistrate independently to judge of the validity of the informant's [c]onclusion that the narcotics were where he said they were." **Id.** at 363-64 (quoting **Spinelli v. United States**, 393 U.S. 410, 413 (1969)). This Court deemed the affidavit

deficient because it did not specify how the girls concluded that the drugs were in the defendant's home. ***Id.*** at 364.

In ***Way***, an undercover police officer asked two suspects to procure methamphetamine for him. ***Way***, 492 A.2d at 1152. The two suspects met with defendant, who provided the drugs. ***Id.*** After the transaction between the defendant and the two suspects, a surveillance officer followed the defendant's vehicle to another location, which turned out to be the defendant's home. ***Id.*** at 1152-53. Thus, the affidavit stated that police followed the defendant to his home after the transaction. We concluded that the affidavit was deficient. "Probable cause to believe that a man has committed a crime does not necessarily give rise to probable cause to search his home." ***Id.*** at 1154. Finding ***Kline*** controlling, we stated: "In our opinion **an allegation based on an assumption or supposition not supported by the facts is insufficient to support (an inference of) criminal activity in the premises**, in spite of the fact that there are plenty of allegations alleged to relate to criminal activity of the individual who is alleged to have lived in the premises." ***Id.*** (emphasis added) (quoting ***Kline***, 335 A.2d at 364).

The ***Way*** Court distinguished ***Commonwealth v. Frye***, 363 A.2d 1202, 1204 (Pa. Super. 1976), in which the affidavit stated that the defendant "was taking telephone orders in furtherance of his illicit business at his home." Thus, we concluded that a "man of reasonable caution would

- 14 -

be warranted in believing that marijuana was being kept at [the defendant's] residence." *Id.* The *Frye* Court found *Kline* distinguishable because, in *Frye*, "the nexus between the evidence to be seized and the place to be searched was provided by [the defendant's] admission that he was conducting at least part of his unlawful operations from his home." *Id.* Thus, the affidavit in *Frye* contained facts relating to a specific defendant.

The Commonwealth would have us hold that, because Appellant was found in possession of a gun mere blocks from his home, it was reasonable to *infer* that some additional evidence of his connection to the gun would be located at his home. The Commonwealth relies on *Jones*, 988 A.2d 649 (Pa. 2010), in which police obtained a warrant to search the dorm room of a murder victim and the defendant tuned out to be the victim's roommate. *Jones*, 988 A.2d at 651-53. Police found, among other things, the victim's cell phone with his blood on it, and several articles of the defendant's clothing with the victim's blood on them. *Id.* at 652. The Supreme Court rejected this Court's conclusion that police lacked probable cause to search the victim's dorm room.

> The relevant evidence set forth in the affidavit of probable cause for the search warrant of the dormitory room was that a body was found shot to death in the City of Chester and that keys found on the body and a university student photograph indicated that a nearby dormitory room was the last known residence of the victim. Accordingly, the police sought to obtain evidence both to confirm the identity of the victim and to further their investigation. That evidence included, as listed in the application for the warrant, cellular telephones and pagers, which, if found, could provide leads with regard to any

individuals who had spoken with or contacted the victim on the night of his murder.

*Id.* at 656. Here, in contrast, the warrant sought "[h]andguns, rifles, shotguns, ammunition, gun storage boxes/containers, holsters, proof of identification, any items of evidentiary value." Warrant #176023. Unlike ***Jones***, in this case it is unclear how any of the items specified in the warrant were of any evidentiary value. Appellant's identification was not in doubt, and police already were in possession of the firearm used in the shooting. Said another way, there is no obvious nexus between the crimes under investigation and the proposed search.

In Pennsylvania, the nexus requirement comes from Pennsylvania's long-standing history of protecting its citizens' privacy under Article 1, Section 8 of the Pennsylvania Constitution. Our Supreme Court reviewed that history in ***Commonwealth v. Edmunds***, 586 A.2d 887 (Pa. 1991). There, our Supreme Court considered whether to adopt the "good faith" exception to the exclusionary rule. *Id.* at 888. In ***United States v. Leon***, 468 U.S. 897 (1984), the United States Supreme Court concluded that evidence gathered during a "good faith" execution of a defective search warrant need not be excluded from evidence. The ***Edmunds*** Court distinguished Pennsylvania jurisprudence, and its historic focus on the right to privacy under Article 1, Section 8, from the ***Leon*** Court's conclusion that the federal exclusionary rule was designed to deter unscrupulous police conduct.

- 16 -

The requirement of probable cause in this Commonwealth thus traces its origin to its original Constitution of 1776, drafted by the first convention of delegates chaired by Benjamin Franklin. The primary purpose of the warrant requirement was to abolish 'general warrants,' which had been used by the British to conduct sweeping searches of residences and businesses, based upon generalized suspicions. Therefore, at the time the Pennsylvania Constitution was drafted in 1776, the issue of searches and seizures unsupported by probable cause was of utmost concern to the constitutional draftsmen.

Moreover, as this Court has stated repeatedly in interpreting Article 1, Section 8, that provision is meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries. "[T]he survival of the language now employed in Article 1, Section 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth.

*Edmunds*, 586 A.2d at 897 (internal citations and quotation marks omitted). Thus, the purpose of Pennsylvania's exclusionary rule is "quite distinct" from that of the federal exclusionary rule under the Fourth Amendment to the United States Constitution. *Id.*

Pennsylvania's exclusionary rule bolsters the "twin aims" of safeguarding privacy and ensuring that warrants issue only upon probable cause.

[Probable cause] is designed to protect us from unwarranted and even vindictive incursions upon our privacy. It insulates from dictatorial and tyrannical rule by the state, and preserves the concept of democracy that assures the freedom of its citizens. This concept is second to none in its importance in delineating the dignity of the individual living in a free society.

*Id.* at 899 (quoting ***Commonwealth v. Miller***, 518 A.2d 1187, 1191-92 (Pa. 1986)).

The ***Edmunds*** Court explained that the right of privacy espoused in Article 1, Section 8 arose in part to keep citizens free from searches based upon generalized suspicions. *Id.* at 897. The Commonwealth would have us permit precisely that. The Commonwealth's rationale—that gun owners are likely to store gun-related items in their homes—does not depend upon the facts of this case. Rather, the Commonwealth's rationale could permit a search of the home of any criminal suspect arrested for committing a crime with a gun, regardless of any particularized reason to believe evidence will be found there. This violates Article 1, Section 8 of the Pennsylvania Constitution and Rule 206(6)[4] of the Pennsylvanian Rules of Criminal Procedure.

_____

[4] Rule 206(6) provides:

> Each application for a search warrant shall be supported by written affidavit(s) signed and sworn to or affirmed before an issuing authority, which affidavit(s) shall:
>
> [...]
>
> (6) **set forth specifically the facts and circumstances which form the basis for the affiant's conclusion** that there is probable cause to believe that the items or property identified are evidence or the fruit of a crime, or are contraband, or are expected to be otherwise unlawfully possessed or subject to seizure, and **that these items or property are or are expected to be located** on the particular person or **at the particular place described**;

*(Footnote Continued Next Page)*

The Commonwealth distinguishes **Kline** and **Way** because those cases involved illicit drugs whereas the instant case involves guns. Commonwealth Brief at 17. Guns, unlike illicit drugs, are lawful to own and thus are more likely to be stored in a home. **Id.** Assuming without conceding the accuracy of this assertion[5] we do not believe such a generalization suffices to create probable cause in a specific case. Were we to hold otherwise, police could obtain a warrant to search a suspect's home in virtually any case in which the suspect possessed or used a gun. Additionally, the Commonwealth's argument applies to many more items than guns. Knives, for example, are lawful but sometimes used in violent crimes. Cell phones are lawful but sometimes used to facilitate unlawful conduct. We do not believe that probable cause for the search of a home arises from nothing more than the suspect's use of a lawful item commonly stored in a home.

Furthermore, the Commonwealth's reliance on **Commonwealth v. Hutchinson**, 434 A.2d 740, 744 (Pa. Super. 1981) is misplaced. There, police obtained a warrant for the suspect's home after he was identified as the perpetrator of an armed robbery. **Id.** At 742-43. The warrant did not

_(Footnote Continued)_ _____

Pa. R. Crim. P. 206(6) (emphasis added).

[5] Some federal courts have held that it is reasonable to infer that drug traffickers **will** often keep drug-related evidence in their residences and businesses. **See United States v. Lull**, 824 F.2d 109, 119 (4th Cir. 2016), **United States v. Whitner**, 219 F.3d 289, 292 (3d Cir. 2000), **United States v. Chew**, 1 F.3d 1248 (5th Cir. 1993), **United States v. Johnson**, 641 F.2d 652 (9th Cir. 1980).

specify guns as an item to be searched for, but police found a gun and seized it. *Id.* This Court concluded that police had probable cause to search the defendant's home (a fact the defendant did not challenge) and that a gun was "reasonably likely to be found in the perpetrator's home, especially given the short period of time between the commission of the crimes and the application for the search warrant." *Id.* at 743. **Hutchinson** is inapposite here because the scope of the warrant, not the locale of the search, was at issue. Furthermore, the suspect was not apprehended in possession of the gun, and this Court found reason to believe that the suspect had time to stash the gun at his home subsequent to the robbery.

In short, **Kline**, **Way**, and **Frye** are directly on point[6] and controlling, and they provide no support for the Commonwealth's position. Each of those opinions required facts establishing case-specific reasons why police believed they would find evidence of a crime in the defendant's home. None of them states or implies that, unlike guns, the nexus requirement is made necessary due to the unlikelihood that drug traffickers would store contraband in their homes.

In light of all of the foregoing, we agree with Appellant that police did not have probable cause to search his home.

_____

[6] That Appellant was apprehended two blocks from his home is of no significance. The Police in **Way** lacked probable cause to search the defendant's home even though they followed the defendant to his home.

Appellant also challenges two other warrants. Warrant number 176024 ("the BMW warrant"), executed later on the same day as the search of Appellant's home, authorized police to search his BMW—the one he was driving and eventually crashed while fleeing police—for "[f]irearms, ammunition, identification, ballistics evidence, narcotics, narcotics paraphernalia and any all [*sic*] items of evidentiary value." Search Warrant #170264. Appellant argues that the evidence seized pursuant to this warrant must be suppressed as fruit of the poisonous tree. The fruit of the poisonous tree doctrine "excludes evidence obtained from, or acquired as a consequence of, lawless official acts." *Commonwealth v. Johnson*, 68 A.3d 930, 946 (Pa. Super. 2013). "A fruit of the poisonous tree argument requires an antecedent illegality." *Id.* Appellant identifies the search of his home as the antecedent illegality.

The record does not support Appellant's argument. The affidavit of probable cause in support of the BMW warrant does not rely on the search of Appellant's home as grounds for searching the BMW. Rather, the affidavit describes the circumstances of the initial stop of the BMW, Appellant's flight in the vehicle, crash, flight on foot, and altercation with police. Affidavit of Probable Cause #170264. Appellant does not address whether these circumstances failed to provide probable cause for the BMW warrant. *See* Appellant's Brief at 33-35. In summary, the affidavit in support of the BMW warrant did not rely on the fruits of the unlawful home search, and Appellant

does not challenge the BMW warrant in any other respect. We therefore affirm the suppression court's order insofar as it denied suppression of evidence recovered during the execution of the BMW warrant.

Appellant also challenges warrant number 170265—a warrant authorizing a search of a Lexus ("the Lexus warrant") parked at Appellant's home—as fruit of the poisonous tree. Police discovered the Lexus during their unlawful search of Appellant's home. Once again, the affidavit of probable cause sets forth facts similar to those in the affidavit in support of the BMW warrant. We find this puzzling, as the affidavit contains no mention of the Lexus, its relationship to the crime under investigation, or why police investigators expected to find evidence of a crime in it. In any event, the affidavit does not support Appellant's argument that the Lexus warrant was fruit of an antecedent illegality. In a footnote, the Commonwealth dismisses Appellant's challenge to the Lexus search as moot because police recovered no relevant evidence from the Lexus. Commonwealth Brief at 18-19 n.6. We reject Appellant's challenge to the Lexus warrant inasmuch as the Commonwealth did not introduce any evidence recovered from the Lexus. Any error in the trial court's ruling was harmless.[7]

_____

[7] Harmless error exists where "the error did not prejudice the defendant or the prejudice was *de minimus*." **Commonwealth v. Hutchinson**, 811 A.2d 556, 561 (Pa. 2002), **cert. denied**, 540 U.S. 858 (2003).
*(Footnote Continued Next Page)*

To summarize, we have concluded that Appellant has offered a meritorious challenge to the search of his home but not to the searches of his vehicles. Given our disposition, a new trial will be required without introduction of the evidence retrieved from Appellant's home.

Appellant's second assertion of error is that the trial court improperly denied his motion to sever the possessory offenses relating to drugs and a blank gun (arising out of the searches of Appellant's home and BMW) from the offenses arising out of police officer assaults. Given our resolution of Appellant's suppression argument, this issue will recur on retrial. The parties have fully briefed the issue, and we therefore proceed to review it.

Appellant argues that severance was required because the drug evidence and blank gun would have been inadmissible at a trial solely for the assault of the officers.[8] We review a trial court's denial of a motion for severance for an abuse of discretion. *Commonwealth v. Mollett*, 5 A.3d 291, 305 (Pa. Super. 2010).

Instantly, the trial court consolidated the charges pursuant to Pennsylvania Rule of Criminal Procedure 582(A)(1):

**(A) Standards**

(1) Offenses charged in separate indictments or informations may be tried together if:

*(Footnote Continued)* ─────────────────

────────────────────────────────────────

[8] Appellant does not argue that the evidence concerning the assault on the officers would have been inadmissible at a separate drug trial.

- 23 -

(a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or

(b) the offenses charged are based on the same act or transaction.

Pa.R.Crim.P. 582(A)(1). Further, Rule 583 permits separate trials if "it appears that any party may be prejudiced" by consolidating charges. Pa.R.Crim.P. 583.

When offenses are not based on the same act or transaction, courts apply the following test to determine whether severance is proper:

[W]hether the evidence of each of the offenses would be admissible in a separate trial for the other; whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, whether the defendant will be unduly prejudiced by the consolidation of offenses.

*Commonwealth v. Thomas*, 879 A.2d 246, 260 (Pa. Super. 2005) (quoting *Commonwealth v. Lark*, 543 A.2d 491, 497 (Pa. 1988)). Concerning the admissibility requirement, "evidence of other crimes may be introduced where such evidence was part of the chain or sequence of events which became part of the history of the case in question and formed part of the natural development of the facts." *Commonwealth v. Kunkle*, 79 A.3d 1173, 1191 (Pa. Super. 2013) (quoting *Commonwealth v. Spotz*, 756 A.2d 1139, 1152 (Pa. 2000)), *appeal denied*, 114 A.3d 1039 (Pa. 2015).

Here, the trial court found that the drugs recovered from Appellant's BMW completed the natural development of the facts, beginning with

- 24 -

Appellant's flight from a vehicle stop and culminating in the violent altercation with police when they finally located him. ***See, e.g.***, ***Commonwealth v. DeHart***, 516 A.2d 656, 661 (Pa. 1986) (no abuse in consolidating the trial for the defendant's escape with subsequent violent crimes committed in furtherance of the escape). Further, the drug evidence provided a motive for Appellant's flight from and subsequent violent resistance of the police. The trial court instructed the jury to consider the evidence in support of the drug offenses separately from the evidence in support of the various assault charges, thus mitigating any possibility of jury confusion. N.T. Trial, 03/06/2015, at 155. We agree with the trial court and the Commonwealth that no undue prejudice occurred, as the Commonwealth presented a substantial body of direct evidence, summarized above, establishing the altercation between Appellant and the police and the shooting of one officer. We discern no abuse of discretion in the trial court's denial of Appellant's motion for severance.

In summary, we conclude that the search of Appellant's home was unlawful because the warrant was not supported by probable cause. In all other respects, we affirm the suppression court's order. We affirm the trial

court's order denying Appellant's motion to sever. We vacate the judgment of sentence and remand for a new trial in accordance with this opinion.[9]

Judgment of sentence vacated. Case remanded. Jurisdiction relinquished.

Judge Musmanno joins the opinion.

Judge Moulton files a concurring opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/22/2017

---

[9] Because we have vacated the judgment of sentence, it is not necessary for us to consider Appellant's third or fourth issues, both of which raise sentencing issues.