**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LAVELLE JOHNSON, | : | |
| | : | |
| Appellant | : | No. 1082 WDA 2017 |

Appeal from the Judgment of Sentence June 27, 2017
in the Court of Common Pleas of Allegheny County,
Criminal Division at No(s):  CP-02-CR-0000765-2015

BEFORE:  BENDER, P.J.E., LAZARUS, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:　　　　　　**FILED OCTOBER 18, 2018**

Lavelle Johnson ("Johnson") appeals from the judgment of sentence entered following his conviction of one count each of possession of a controlled substance (heroin), and possession with intent to deliver a controlled substance (heroin).[1]  We affirm.

On November 23, 2014, at approximately 2:43 a.m., Pittsburgh Police officers were dispatched to 2143 Rhine Street, Apartment 2D, for a call regarding possible shots fired.  Upon arriving at the apartment's door, officers heard loud talking and shouting inside of the apartment, and noticed an odor of marijuana.  Narcotics Agent Joseph Barna ("Agent Barna") knocked on the door of Apartment 2D, and could hear whispering and movement inside of the

---

[1] 35 P.S. § 780-113(a)(16), (30).

residence. Agent Barna also heard the sound of metal hitting the floor inside the apartment. Believing the sound to be a firearm, Agent Barna told the other officers to take cover outside of the apartment. Several minutes after police first knocked, a female opened the door to the apartment. Upon entering the apartment, officers encountered Johnson, Eli Herring ("Herring"), Kent Morton ("Morton"), Jaquayla Kendrick ("Kendrick") and Jemera Hibbler ("Hibbler"). The officers began "clearing the residence for possibly hurt people." N.T., 5/24-25/16, at 73. While clearing the area, Agent Barna saw, in a closet with an open door, one full brick and a partial brick of suspected heroin, comprised of packages wrapped in "pornographic paper." *Id.* at 74. Another officer found several firearms in a closet. Agent Barna also found 15 stamp bags of heroin on top of the kitchen cupboard. The officers arrested all occupants of the apartment. In a search of Johnson incident to his arrest, officers recovered two cell phones and U.S. currency.

Officers subsequently sought and were granted a search warrant for the apartment. Upon execution of the search warrant, officers seized a Pennsylvania identification card for Herring, suspected heroin, a digital scale, ammunition, cellular telephones, U.S. currency, and a small amount of suspected marijuana. Pursuant to a second search warrant, Pittsburgh Computer Crime Unit detectives analyzed the contents of the Samsung cell phone recovered from Johnson.

Johnson filed an Omnibus Pretrial Motion to suppress the evidence seized by police after their entry to the apartment and upon execution of a search warrant. After a hearing, the suppression court denied the Motion. Johnson also filed a supplemental Motion to suppress the digital contents of his cell phone, which, after a hearing, the suppression court also denied.

The matter proceeded to a jury trial, of Johnson and his four co-defendants, on the charges of possession with intent to deliver heroin, possession of heroin and possession of a small amount of marijuana, **see** 35 P.S. § 780-113(a)(32).[2] However, on May 25, 2016, the Honorable David R. Cashman ("Judge Cashman") declared a mistrial. Thereafter, the case was reassigned to the Honorable Thomas E. Flaherty ("Judge Flaherty").

Johnson filed a Motion to bar his retrial, claiming a violation of his constitutional protection against double jeopardy. Judge Flaherty denied the Motion. Following a bench trial, Judge Flaherty found Johnson guilty of possession with intent to deliver heroin and possession of heroin, but not guilty of possession of a small amount of marijuana. Thereafter, for his conviction of possession with intent to deliver heroin, the trial court sentenced Johnson to one to two years in prison, with a credit of 94 days for time served.[3]

---

[2] The firearms charges were severed from the narcotics charges for trial.

[3] Johnson's conviction of possession of heroin merged for sentencing purposes.

Johnson filed a timely Notice of Appeal, followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

Johnson now raises the following issues for our review:

1. Whether Judge Cashman erred in granting a mistrial[,] *sua sponte*, and, upon his reassignment of the case to Judge Flaherty, his honor erred in denying [Johnson's] Motion to Bar the second trial under state and federal double jeopardy principles?

2. Whether the trial court erred in denying [Johnson's] supplemental Omnibus Pretrial Motion and not suppressing evidence seized from a cell phone because the search warrant for the cell phone lacked probable cause and was overbroad, in violation of the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution?

Brief for Appellant at 5.

Johnson first claims that Judge Cashman improperly declared a mistrial, *sua sponte*, and consequently, Judge Flaherty erred by denying Johnson's Motion to bar a retrial on double jeopardy grounds. *Id.* at 28. Citing this Court's decision in ***Commonwealth v. Kelly***, 797 A.2d 925 (Pa. Super. 2002), Johnson argues that in the instant case, there was no "manifest necessity" warranting Judge Cashman's declaration of a mistrial. Brief for Appellant at 35. According to Johnson, the key similarities between this case and the circumstances in ***Kelly*** are that "in both cases[,] the mistrial was declared due to the behavior of defense counsel in conducting themselves; and in both cases, the record was inadequate to demonstrate that the jury hearing the case could not decide the case impartially." *Id.* at 34.

Johnson further argues that Judge Cashman improperly failed to consider less drastic options, thereby rendering the *sua sponte* declaration of a mistrial unsupported by manifest necessity. *Id.* at 36. Johnson points out that there was no on-the-record discussion of less drastic remedies other than the declaration of a mistrial. *Id.* at 37. In addition, Johnson observes, the mistrial was declared because of defense counsel's legitimate advocacy. *Id.*

"It is within a trial judge's discretion to declare a mistrial *sua sponte* upon the showing of manifest necessity, and absent an abuse of that discretion, we will not disturb his or her decision." ***Commonwealth v. Walker***, 954 A.2d 1249, 1254 (Pa. Super. 2008) (*en banc*) (citations omitted).

> In accordance with the scope of our review, we must take into consideration all the circumstances when passing upon the propriety of a declaration of mistrial by the trial court. The determination by a trial court to declare a mistrial after jeopardy has attached is not one to be lightly undertaken, since the defendant has a substantial interest in having his fate determined by the jury first impaneled. ***Commonwealth v. Stewart***, 456 Pa. 447, 452, 317 A.2d 616, 619 (1974), citing ***United States v. Jorn***, 400 U.S. 470, 91 S. Ct. 547, 27 L. Ed. 2d 543 (1971). Additionally, failure to consider if there are less drastic alternatives to a mistrial creates doubt about the propriety of the exercise of the trial judge's discretion[,] and is grounds for barring retrial[,] because it indicates that the court failed to properly consider the defendant's significant interest in whether or not to take the case from the jury. ***Commonwealth, ex rel. Walton v. Aytch***, 466 Pa. 172, 352 A.2d 4 (1976). Finally, it is well established that any doubt relative to the existence of manifest necessity should be resolved in favor of the defendant. [***Commonwealth v.***] ***Bartolomucci***, 468 Pa. [338,] 347, 362 A.2d [234,] 239 [(Pa. 1976)].

- 5 -

***Commonwealth v. Diehl***, 615 A.2d 690, 691 (Pa. 1992); ***accord Kelly***, 797

A.2d at 936-37.  Nevertheless,

> [w]e do not apply a mechanical formula in determining whether a trial court had a manifest  need to declare a mistrial.  Rather, varying and often unique situations arise during the course of a criminal trial ... [and] the broad discretion reserved to the trial judge in such circumstances has been consistently reiterated[.]

***Commonwealth v. Orie***, 88 A.3d 983, 996-97 (Pa. Super. 2014) (internal

quotation marks and citations omitted).

In ***Kelly***, upon which Johnson relies, the trial judge decided to recuse

himself, and declare a mistrial *sua sponte*.  ***Kelly***, 797 A.2d at 933.  The trial

judge felt compelled to do so, stating that he could not fairly judge the case

based upon his rancor with the prosecutor.  ***Id.***  Specifically, the trial court

informed the jury that

> [t]he issue of a mistrial typically comes up in the context of a [j]udge acting to assure a fair trial for a [d]efendant.  I would see no reason why that same concern should not be afforded [to] the Commonwealth, although I acknowledge that when there is any doubt as to the manifest [necessity] of declaring a mistrial, that doubt must be resolved in the [d]efendant's favor….
>
> … My frustration in all honesty, has been with [c]ounsel for the Commonwealth in this matter, and his manner in which he has conducted the case on behalf of the Commonwealth….

***Id.***  When the Commonwealth sought to retry the defendants, the defendants

filed motions to dismiss and bar re-prosecution on double jeopardy grounds.

***Id.*** at 935.  The trial court granted the defendants' motions.  ***Id.***

On appeal, this Court reversed the trial court, holding that "we are not

convinced that the trial judge's obvious frustration with the 'bombastic'

- 6 -

prosecutor and concern that he might appear biased against the Commonwealth, without clear impact on the jury, would support a determination of manifest necessity." *Id.* at 938. This Court explained that, "[t]o automatically grant a mistrial whenever the prosecution, through its trial conduct, is 'shooting [itself] in the foot with the jury,' the trial judge would often, in effect, be unconstitutionally exercising his authority to help a prosecution that is going badly by affording the state another more favorable opportunity to convict the accused." *Id.* at 939. Thus, "if the Commonwealth makes mistakes which damage its prosecution, it is not entitled to a second bite at the apple due to its poor performance." *Id.* at 940.

Here, it was actions of *defense counsel*, and not the Commonwealth, that precipitated the declaration of a mistrial. At trial, an issue arose regarding whether defense counsel had agreed to the Commonwealth's offer to stipulate that no DNA, fingerprint, or gunshot residue testing was conducted by police on the items seized from Apartment 2D. The issue first arose during the cross-examination of Agent Barna by Johnson's counsel, Kenneth Haber, Esquire ("Attorney Haber"):

> Q. [Attorney Haber:] I'm not sure you are the precise person to ask this, but you are up there now so I'll ask it. Did you know of any gunshot residue tests that were administered to anybody?
>
> A. [Agent Barna:] You'll have to refer to [Pittsburgh Police Officer Clayton Black ("Officer Black")].
>
> Q. As far as you know, you have no knowledge?
>
> A. No knowledge.

> **[The prosecutor, Lawrence Sachs, Esquire ("Attorney Sachs")]: The Commonwealth would be willing to stipulate that no such test was performed.**
>
> **THE COURT: Okay.**
>
> **[Attorney Haber]: Thank you.**

N.T., 5/24-25/16, at 109-10 (emphasis added). Thus, it appears from the record that Attorney Haber agreed to the Commonwealth's offer of a stipulation.

During the cross-examination of Agent Barna, counsel for Morton (Angela Carsia, Esquire ("Attorney Carsia")) and counsel for Kendrick (Patrick Sweeney, Esquire ("Attorney Sweeney")) each asked Agent Barna whether the 15 glassine stamp bags seized by police underwent DNA analysis or testing for fingerprints, and each time, Agent Barna responded in the negative. *Id.* at 117-18, 120-22.

During the cross-examination of Agent Barna, Hibbler's counsel, Jacob McCrea, Esquire ("Attorney McCrea")[4] made the same inquiry:

> Q. [Attorney McCrea:] And not to belabor a point that has already been made by the other four lawyers, but we have no fingerprints or DNA connecting [Hibbler] with the scale, the heroin, the marijuana, or anything else in that apartment; correct?
>
> **[Attorney Sachs]: Your Honor, if it would help the [c]ourt and the [j]ury, the Commonwealth would stipulate there is no DNA or fingerprint evidence of any kind.**
>
> **THE COURT: Okay.**

_____

[4] Attorney McCrea represents Johnson in the present appeal.

- 8 -

> **[Attorney McCrea]: We will accept that.** Your Honor, I have nothing further for Agent Barna. Thank you, sir.
>
> [Agent Barna]: Thank you sir.
>
> [Attorney McCrea]: Just as a follow[ ]up to the stipulation—
>
> THE COURT: No. [Attorney Sachs], do you have anything on redirect?
>
> [Attorney Sachs]: Yes, Your Honor.

*Id.* at 125 (emphasis added). Thus, Hibbler's counsel also agreed to the Commonwealth's proposed stipulation.

During the recross-examination of Agent Barna, counsel for Johnson, Attorney Haber, again asked about the lack of fingerprint or DNA testing, notwithstanding his prior agreement to the Commonwealth's stipulation:

> Q. Detective, the issue of submission of items for DNA or fingerprints, it is not that there is no -- anybody's DNA or prints on these items, the more accurate thing to say about it would be it was never looked for; correct?
>
> A. Due to budgetary issues, we did not do the DNA, fingerprint.
>
> Q. I understand the reason may be budgetary, but I just want to clarify, it wasn't even attempted?
>
> A. We did not send it to get fingerprinted.

*Id.* at 131.

Attorney Haber raised the issue again during his cross-examination of Pittsburgh Police Officer Jenny Monteleone ("Officer Monteleone"):

> Q. [Attorney Haber:] Are you the one who retrieved those three guns?

- 9 -

A. [Officer Monteleone:]  Yes.

Q. Did you do so with care, so to speak?

A. Yes.  I do believe I had gloves on.

Q. You had gloves on?

A. Yes.

Q. Is that your general practice?

A. Yes.

Q. Why do you do that?

A. Typically, if a firearm is recovered, we try to maintain it, if there is any DNA evidence on there.

Q. Or fingerprint evidence?

A. Yes.

Q. Have you recovered guns with gloves on before?

A. Yes.

Q. Have you submitted them for those two tests?

A. Yes.

Q. Was that done in this case?

**[Attorney Sachs]: Your Honor, the Commonwealth has previously stipulated that none of these items were sent for either DNA or fingerprint examination.**

**THE COURT: I thought you already did.**

**[Attorney Sachs]: I did, but I was hoping to do that so we wouldn't have to keep hearing the same questions for every witness.**

*Id.* at 143-44 (emphasis added).

Notwithstanding the reminder of his prior agreement to the stipulation, Attorney Haber pursued this same inquiry during his cross-examination of Officer Black:

Q. [Attorney Haber:] In terms of the evidence that was gathered, after the search warrant, the heroin, and there were some firearms; correct?

A. [Officer Black:] Correct.

Q. Now, you would make the decision as to what gets submitted to the lab or not; correct?

A. Well, we have policies, I mean, that certain things get submitted to the Crime Lab. Certain things get submitted to the property room. So I'm under those constraints. I can't decide this goes here or -- I don't necessarily have that option.

Q. And do you remember testifying at the preliminary hearing that was referenced a few moments ago, the District Attorney, not [Attorney] Sachs, but [counsel] asked you, "And all of the firearms, were they submitted for prints --" meaning fingerprints, "and DNA?" Do you remember being asked that?

A. I don't remember it specifically, but that's usually the question that is asked.

[Attorney Sachs]: Once again, the Commonwealth objects to the relevance of this line of inquiry. We already stipulated that nothing was submitted for testing of that sort.

[Attorney Haber]: I don't accept that stipulation.

THE COURT: I'm sorry?

[Attorney Haber]: On behalf of [] Johnson, I don't accept that stipulation.

THE COURT: You didn't object to it.

[Attorney Haber]: I didn't stipulate yesterday.

- 11 -

THE COURT:  No.  That issue has always been resolved.

[Q. Attorney Haber to the witness:] You did submit this for fingerprint –

THE COURT:  No, [Attorney] Haber, that issue has already been resolved.  The guns weren't submitted for fingerprints and they weren't submitted for DNA.

[ATTORNEY] HABER:  Yes, they were.

THE COURT:  Thank you.  Move on.

…

(The following discussion was held at sidebar.)

[Attorney Haber]:  I do understand the [c]ourt's ruling, but I do feel compelled, on behalf of my client, to at least create a record for why I was asking the questions and the evidence that I can proffer as to the foundation for it.  At the preliminary hearing, this officer, who is on the stand now, [Officer] Black, testified in response to the District Attorney's question, that he submitted all of the firearms and drugs for fingerprints and DNA testing.  He was asked, "Are the results back? Are they still pending?"  He said, "They are still pending."  I do believe it is a relevant inquiry in a case such as this, where five people are in a house where they don't live in.   And I do understand the [c]ourt's ruling, but in order to preserve the issue for appeal, I do feel compelled that I have to make the record.  And I apologize to the [c]ourt.  I'm not trying to do anything but represent my client on issues that I believe are relevant.

THE COURT:  I already ruled on it.

[Attorney Haber]:  I understand.

THE COURT:  Thank you.

(End of sidebar.)

*Id.* at 188-93.

- 12 -

The next day, all counsel for the defendants approached the trial court to make the following inquiry, outside of the presence of the jury:

[Attorney Sweeney]: Your Honor, on behalf of [] Kendrick, I think I'm speaking for all five of us, with respect to the stipulation, it sort of came to a head during [Attorney] Haber's cross-examination, and what we are allowed to ask and what we are not allowed to ask. There was an offer to stipulate, by the prosecution, that I don't believe any of us really stood up and accepted. It was just sort of understood there is no DNA or fingerprint evidence against any of our clients, and we know there will not be none submitted; however, we did not believe that would preclude us from asking why. In particular[,] with respect to Officer Black's testimony, he was asked at the preliminary hearing, by the prosecutor at the preliminary hearing, if the firearms were submitted for prints and DNA. He said they were. "Are those results pending? Are the results back or are they still pending." He indicated, "They are pending." We would like to ask about those issues and who made the decisions, what was submitted, and what was not, what was tested and what was not. We think those are still relevant. We obviously know there isn't any DNA or fingerprint evidence that will be introduced. We do believe we should be able to ask about and argue about those questions. So to clarify what we are stipulating to and what we are not stipulating to –

THE COURT: I don't think there needs to be any clarification of anything. I already ruled on that issue. No.

[ATTORNEY] SWEENEY: We would just like to make that record.

THE COURT: Would anybody else like to add their two cents?

[ATTORNEY] McCREA: Just for clarification –

THE COURT: Clarification on what?

[ATTORNEY] McCREA: Are you saying we can't argue that they should have gotten DNA evidence?

THE COURT: No. I said you didn't object to the stipulation. You accepted the stipulation. It is not relevant.

- 13 -

[ATTORNEY] McCREA:  And I do not wish to belabor that point in any way, shape or form.

THE COURT:  Then why are you?  Go right ahead.  Belabor it all you want.

[ATTORNEY] McCREA:  No, it wouldn't serve any purpose.

[ATTORNEY] WESTCOTT: Your Honor, for the record, [Attorney] Westcott on behalf of [] Herring.  I don't believe I ever stipulated. [Attorney] Sachs said he would stipulate.  And I believe you said, "Move on."  I don't believe we ever accepted the stipulation or that we intended to accept the stipulation.  Nevertheless, I want to put that on the record.

THE COURT:  You didn't reject the stipulation.

[ATTORNEY] WESTCOTT:  I'm not sure I didn't reject it, but I didn't accept it.

THE COURT:  Okay.  We'll start all over.  I'll declare a mistrial and you can start all over.  You can take [the defendants] back.  We are done.

[ATTORNEY] SWEENEY:  Your Honor, we are not asking for a mistrial.

THE COURT:  I granted it.  [Attorney] Haber already asked for it.

[ATTORNEY] HABER:  I didn't ask for a mistrial.

THE COURT:  Yeah, you are going to get one.  You have attempted to trample on every ruling I made, and you haven't had the courtesy to look me in the eye.  You are talking to people over there.  We are done.

[ATTORNEY] SACHS:  I would ask the [c]ourt to reconsider its decision.

THE COURT:  I'll see you at 1:30.  Bring your lawyers.

(RECESS)

…

- 14 -

THE COURT [to all defense counsel]:  I have a collective question for all of you.  What is so difficult about understanding the word "no?"  Nobody wants to talk?  Everybody wanted to talk this morning.  [Attorney] Haber pulled that little stunt at the end of the day—or at the end of the morning session, having [Attorney] Sweeney act as his stag horse, because he was afraid I was going to hold him in contempt, and I would have.  Nobody wants to address that question?

[Richard Narvin, Esquire ("Attorney Narvin"):]  … I'm here on behalf of [Attorney] McCrea, who is one of the attorneys here.  I think I would ask the Court to elaborate a bit as to directly how that question affects [Attorney] McCrea and in what context.

THE COURT:  [Attorney] McCrea, if I can repeat his statement, "I don't want to belabor the point, but –" I had already ruled on it four times.

[ATTORNEY] NARVIN:  So there is a specific question you believe he kept asking when you told him not to?

THE COURT:  Yes.

[ATTORNEY] NARVIN:  So, do you recall what that question is?

[ATTORNEY] McCREA:  My recollection, [Attorney] Narvin, was that I wished for a clarification from the Court regarding the parameters of what the Court had already ruled on, on the one hand, and what was still permissible argument in questioning on the other, rather –

THE COURT:  What courtroom were you in this morning?

[ATTORNEY] McCREA:  Your Honor's courtroom.

THE COURT:  What you needed a clarification on was beyond me.  It was real [*sic*] simple.  The question of whether or not the items were submitted and the reason why they were not was irrelevant.

[ATTORNEY] NARVIN:  Well, in response, Your Honor, I've known [Attorney] McCrea for some time, and I believe he was attempting to advocate on behalf of his client.  I don't think he meant any

- 15 -

disrespect towards you, towards the [c]ourt, or the Criminal Justice System.

THE COURT:  Well, you weren't here.

[ATTORNEY] NARVIN:  I appreciate that, Your Honor, but I'm trying to get that established for the record.

THE COURT: [Attorney] Westcott?

[ATTORNEY] WESTCOTT:  I do know now your position.  I do know now with clarity what your order was, and is, and remains.  And I do understand "no."

[Counsel for Attorney Carsia]:  On behalf of my client, [Attorney] Carsia, she is going to abide by whatever ruling this Court makes. She has nothing to say about any issue that she has with the Court's ruling.  Whatever the [c]ourt rules, she is going to abide by.  I'm here on her behalf.  I don't think she really spoke today about anything.  She is here to comply with whatever the [c]ourt desires.

[Counsel for Attorney Haber]: …  [Attorney] Haber was not clear on whether or not there was a stipulation, and if there was, the scope of the stipulation.

THE COURT: What courtroom was he in yesterday?

[Counsel for Attorney Haber]:  This courtroom, Your Honor.  So if he was mistaken, he certainly stands corrected.  He was inquiring into a line of cross-examination that he believed was outside the scope of the stipulation, and he apologizes for the inconvenience to the Court and any stress created.

THE COURT:  What I'm going to do is recuse myself, because I can guarantee you these defendants cannot get a fair trial because of the disrespect that has been demonstrated by counsel in this matter.  We are going to declare a mistrial, and you can be reassigned to another courtroom.   Thank you.

[Counsel for Attorney Carsia]: Thank you, Your Honor.

THE COURT: [Attorney] Haber, why don't you put an inventory of your cases together, so I can see where I can send them, too.

- 16 -

[ATTORNEY] HABER: There was no disrespect intended, Your Honor.

THE COURT: Get an inventory of your cases. Thank you.

*Id.* at 214-22.

Thus, the record reflects that at trial, Johnson's counsel, Attorney Haber, initially agreed to a stipulation, then ignored his agreement repeatedly. Further, Attorney Haber later denied having agreed to the stipulation. Judge Cashman's concern over the prejudice resulting from Attorney Haber's conduct, and his potential bias, and his finding of manifest necessity warranting the declaration of a mistrial, are supported by the record. Further, the record does not support a finding that any alternative existed other than the declaration of a mistrial.

As this Court emphasized in *Kelly*, "the public's interest in fair trials designed to end in just judgments … is negatively impacted when a prejudicial element is injected or discovered at trial. In such a situation, a mistrial serves to eliminate the prejudicial element and foster a just judgment." *Kelly*, 797 A.2d at 939 (internal citations omitted).

> Undoubtedly, neither party has a right to have his case decided by a jury which may be tainted by bias; in these circumstances, the public's interest in fair trials designed to end in just judgements must prevail over the defendant's valued right to have his trial concluded before the first jury impaneled.

*Id.* (internal quotation marks and citations omitted).

While we are cognizant that doubts relative to the existence of manifest necessity should be resolved in favor of the defendant, the decision to declare a mistrial *sua sponte* is left to the sound discretion of the trial court. ***Kelly***, 797 A.2d at 936. Utilizing this standard of review, and upon consideration of the aforementioned facts, we conclude there was no abuse of discretion in Judge Cashman's decision. Because we conclude that Judge Cashman declared a mistrial due to manifest necessity, we further conclude that it correctly denied Johnson's Motion to bar his retrial. ***See id.*** (concluding that, when the trial court declares a mistrial *sua sponte* due to manifest necessity, neither the Fifth Amendment to the United States Constitution, nor Article I, § 10 of the Pennsylvania Constitution will bar retrial).

Johnson next claims that the suppression court improperly denied his supplemental Motion to suppress the digital evidence recovered from his cell phone. Brief for Appellant at 38. Johnson alleges that the warrant to search his cell phone was not supported by probable cause. ***Id.*** at 38-39. In support, Johnson points out that no narcotics, evidence of drug use, or firearms were found on his person. ***Id.*** at 44. Further, Johnson asserts that four other individuals were in the house at the time, making it less likely that the narcotics and firearms seized from the residence belonged to Johnson. ***Id.*** Further, Johnson argues that he was not the lessor of the apartment in which the firearms and narcotics were found. ***Id.*** Because no evidence connected

him to the firearms or narcotics, Johnson asserts that there was no probable cause to search his cell phone. *Id.*

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion

> is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

***Commonwealth v. Singleton***, 169 A.3d 79, 82 (Pa. Super. 2017) (citations omitted).

A search warrant must be supported by probable cause. U.S. CONST. AMEND. IV; PA. CONST. ART. I, § 8. "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." ***Commonwealth v. Torres***, 177 A.3d 263, 270 (Pa. Super. 2017) (citations omitted).

> Before an issuing authority may issue a constitutionally valid search warrant, he or she must be furnished with information sufficient to persuade a reasonable person that probable cause exists to conduct a search. The standard for evaluating a search warrant is a "totality of the circumstances" test as set forth in ***Illinois v. Gates***, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d

527 [] (1983), and adopted in **Commonwealth v. Gray**, [] 503 A.2d 921, 503 A.2d 921 ([Pa.] 1985). A magistrate is to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. The information offered to establish probable cause must be viewed in a common sense, nontechnical manner. Probable cause is based on a finding of the probability, not a *prima facie* showing of criminal activity, and deference is to be accorded a magistrate's finding of probable cause.

**Commonwealth v. Rapak**, 138 A.3d 666, 670-71 (Pa. Super. 2016) (some internal quotation marks and citation omitted).

In the instant case, the Affidavit of Probable Cause underling the search warrant for the cell phone stated, in relevant part, as follows:

Your affiants are members of the Pittsburgh Bureau of Police currently assigned as patrol officers in Zone 1. Affiant [Officer] Black has been a police officer with the City of Pittsburgh since July of 2011 and assigned to Zone 1 since June 2012. Affiant [Officer] Black has made numerous arrests for firearms and controlled substances.

Affiant [Officer] Marabello has been a police officer since 1991 and a police officer for the City of Pittsburgh since May of 2000. Affiant [Officer] Marabello has been assigned to the Narcotics and Vice Unit since September of 2006 to November of 2013. Affiant [Officer] Marabello has been involved in over three hundred undercover purchases of illegal narcotics with your affiant purchasing drugs hand to hand from drug dealers. Affiant [Officer] Marabello has also been involved in, or supervised hundreds of controlled purchases of illegal narcotics. Affiant [Officer] Marabello has extensively interviewed hundreds of individuals involved in selling or using illegal narcotics. These individuals have provided your affiants with detailed information concerning how illegal narcotics are sold and used. In addition to standard state mandated police training[, Officer Marabello] has received additional training in narcotics[,] including DEA Narcotics Investigation Course, PA Attorney General's Top Gun Narcotics

Investigation Course, as well as other courses related to narcotics investigations. Affiant [Officer] Marabello [(Affiants Black and Marabello hereinafter collectively referred to as "Affiants")] has worked jointly in narcotics investigations with other agencies including the DEA, FBI, Pennsylvania State Attorney General's Office, and the Allegheny County Police Narcotic's Unit[.]

….

On 11/23/14 at 0243 hours your [A]ffiants received a 911 dispatch call where the complaintant [sic] wished to remain annonymous [sic]. The call stated that shots were fired inside of … Apt 2D. Affiants went to this apartment[.]

Affiants approached the front door of Apt 2D and smelled a strong odor of burning marijuana coming from inside of the apartment and could hear individuals moving inside of Apt 2D. Affiants knocked and announced their presence fearing someone might be shot or injured inside. Affiants continued to knock for several minutes with no response. A female later identified as [] Hibbler eventually opened the door.

Affiants did a protective sweep of the apartment and detained five (5) individuals. [] Herring … [,] [] Johnson … [,] [] Morton … [,] [] Kendrick … [,] [and] Hibbler …. During the protective sweep Officers observed in plain view two (2) bricks of heroin on a shelf. For officer safety, officers did a cursory search for firearms. Officers recovered three stolen firearms hidden together above the apartment's hot water tank. The five detained individuals were then placed under arrest. Officers secured the apartment and obtained a search warrant.

[In a] [s]earch incident to arrest[,] Officers recovered two cell phones from [] Johnson and two cell phones from [] Morton[.]

The Apartment Search [W]arrant was signed on 11/23/14 at 0600 hours by District Justice Zoller. Officers executed the warrant at approximately 0610 hours. Officers conducted a systematic search of the residence. Officers recovered an additional 717 stamp bags of heroin and three cell phones from the living room area.

From previous drug investigations your affiants have been involved with, your Affiants have become aware that persons

involved in the trafficking of controlled substances regularly use cellular telephones to accomplish their trafficking activities. These persons additionally maintain within their cellular telephones, information that includes the telephone numbers of persons to whom they distribute controlled substances[], the telephone numbers of persons from whom they obtain controlled substances to distribute, abbreviations or acronyms for the persons to whom they distribute controlled substances[], the persons from whom they obtain controlled substances to distribute, and pictures of controlled substances, firearms, and quantities of monies [*sic*].

Affidavit of Probable Cause, 3/15/15.

Summarizing, the Affidavit of Probable Cause averred that the police received a call regarding shots fired inside of Apartment 2D; when officers knocked on the door of Apartment 2D, they heard voices inside, but no one opened the door for several minutes; officers found Johnson and four other persons inside of Apartment 2D; as officers conducted a protective sweep of the apartment, they found, in plain view, two bricks of heroin and three firearms; Johnson possessed two cell phones on his person; and, during the execution of a search warrant for Apartment 2D, officers seized an additional 717 stamp bags of heroin and three additional cell phones. ***See id.***

Thus, the evidence established that Johnson was in close proximity to firearms and evidence of the distribution of heroin. Based upon the foregoing, the evidence established probable cause for officers to believe that additional evidence of narcotics distribution would be found on Johnson's cell phone. Consequently, we cannot grant Johnson relief on this claim.

Johnson also argues that the warrant to search his cell phone was overbroad.[5] Brief for Appellant at 39, 45. Johnson claims that

> there was no limitation whatsoever as to the date or time frame of the potential evidence, nor is there any limitation to the evidence which is potentially relevant to the sole issue(s) in the case: whether the guns and drugs found in the apartment were possessed by [Johnson] or someone else.

*Id.* at 48. Johnson posits that the scope of the warrant at issue is dramatically more broad than the search warrant in ***Commonwealth v. Dougalewicz***, 113 A.3d 817 (Pa. Super. 2015), which, Johnson acknowledges, survived an overbreadth challenge. Brief for Appellant at 48. Johnson compares the instant warrant to the search a flash drive in ***Orie***, which was held to be unconstitutionally overbroad. *Id.* at 49. According to Johnson, the issue in this case was whether Johnson possessed the narcotics and/or firearms found in the apartment. *Id.* at 50. Johnson contends that "where ... the alleged criminal acts took place over a short period of time[,] and were factually simple, the scope of … a valid search warrant[] should be narrowed accordingly." *Id.*

Article I, Section 8 of the Pennsylvania Constitution provides, in pertinent part, that "no warrant to search any place or to seize any person or

---

[5] In its Opinion, the trial court opined that this issue was not preserved for appellate review. *See* Trial Court Opinion, 3/13/18, at 4. However, our review discloses that Johnson raised this issue in his Supplemental Omnibus Pretrial Motion. *See* Supplemental Omnibus Pretrial Motion, 5/10/16, at ¶¶ 25-26. It is thus preserved for our review.

things shall issue without describing them as nearly as may be, nor without probable cause ...." PA. CONST. ART. I, § 8.

> It is a fundamental rule of law that a warrant must name or describe with particularity the property to be seized and the person or place to be searched. ... The particularity requirement prohibits a warrant that is not particular enough and a warrant that is overbroad. These are two separate, though related, issues. … A warrant unconstitutional for its overbreadth authorizes in clear or specific terms the seizure of an entire set of items, or documents, many of which will prove unrelated to the crime under investigation …. An overbroad warrant is unconstitutional because it authorizes a general search and seizure.
>
> ….
>
> The language of the Pennsylvania Constitution requires that a warrant describe the items to be seized "as nearly as may be ...." The clear meaning of the language is that a warrant must describe the items as specifically as is reasonably possible. This requirement is more stringent than that of the Fourth Amendment, which merely requires particularity in the description. The Pennsylvania Constitution further requires the description to be as particular as is reasonably possible .... Consequently, in any assessment of the validity of the description contained in a warrant, a court must initially determine for what items probable cause existed. The sufficiency of the description must then be measured against those items for which there was probable cause. Any unreasonable discrepancy between the items for which there was probable cause and the description in the warrant requires suppression. An unreasonable discrepancy reveals that the description was not as specific as was reasonably possible.

*Orie*, 88 A.3d at 1002-03 (citations omitted). "Because the particularity requirement in Article I, Section 8 is more stringent than in the Fourth Amendment, if the warrant is satisfactory under the Pennsylvania Constitution it will also be satisfactory under the federal Constitution." *Id.* at 1003.

- 24 -

In **Orie**, the defendant, a Pennsylvania Supreme Court justice, was charged with, *inter alia*, theft of state property and theft by the diversion of services with regard to the misuse of state personnel and property, for her political campaign. **Orie**, 88 A.3d at 990. This Court found that a warrant to search the defendant's flash drive was overbroad where it sought "any contents contained therein, including all documents, images, recordings, spreadsheets or any other data stored in digital format." **Orie**, 88 A.3d at 1008. The Court stressed that there was no limitation to account for non-criminal use of the flash drive. **Id.**[6]

Here, unlike in **Orie**, the warrant to search Johnson's cell phone sought evidence regarding the ongoing distribution of narcotics by Johnson and his co-defendants. The affidavit attached to the March 31, 2015, supplemental search warrant averred that

> [f]rom previous drug investigations your [A]ffiants have been involved with, your Affiants have become aware that persons involved in the trafficking of controlled substances regularly use cellular telephones to accomplish their trafficking activities. These persons additionally maintain within their cellular telephones, information that includes the telephone numbers of persons to whom they distribute controlled substances to, the telephone numbers of persons from whom they obtain controlled substances

---

[6] By contrast, in **Dougalewicz**, the defendant, a girls' softball coach, was accused of sexually assaulting a 14-year-old player on the team. **Dougalewicz**, 113 A.3d at 820-21. This Court upheld a warrant to search the contents of the defendant's cell phone, for a defined period of time, for text messages, phone calls and picture mail to or from the defendant in regard to the victim. **Id.** at 828.

to distribute, abbreviations or acronyms for the persons to whom they distribute controlled substances to, the persons from whom they obtain controlled substances to distribute, and pictures of controlled substances, firearms, and quantities of monies.

Affidavit of Probable Cause, 3/31/15, at 1.

Unlike in **Orie**, evidence of a narcotics distribution enterprise would not be limited to a distinct period of time, a limited number of people, or a particular form of digital file. Therefore, the breadth of the search warrant was necessary and reasonable due to the digital storage capacity of the electronic device to be searched at that time. **See Dougalewicz**, **supra**. Under these circumstances, we cannot conclude that the supplemental search warrant was constitutionally overbroad. Accordingly, we cannot grant Johnson relief on this claim.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date:  10/18/2018