J-A29043-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GREGORY HAVICAN | : | No. 291 WDA 2024 |

Appeal from the Order Entered February 13, 2024
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0000420-2023

BEFORE:  OLSON, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:　　　　　　**FILED: FEBRUARY 13, 2025**

The Commonwealth appeals from the suppression court's February 13, 2024 order granting Gregory Havican's motion to suppress.  It argues that the suppression court erred in concluding that certain search warrants were not supported by probable cause and, alternatively, that Mr. Havican granted officers permission to search his property.  After careful review, we affirm.

This case began when the Pennsylvania State Police (PSP) became aware of a video taken from a worker at Mr. Havican's farm purportedly depicting the living conditions of certain canines, including the depiction of a puppy eating from the body of a deceased animal.  N.T., 11/30/23, at 9, 21-22.  After viewing the video, PSP troopers interviewed the man who recorded it, a former employee at Mr. Havican's farm.  *Id.* at 22.  Thereafter, the troopers went to Mr. Havican's residence to investigate.  *Id.* at 9, 22.  Mr. Havican gave the troopers both written and oral consent to search the kennels

and check on the welfare of the animals. *Id.* at 22-23. On request, Mr. Havican escorted troopers to view a burn pile he had on his property, and the troopers independently found a second burn pile, observing the body of a deceased puppy on top of the pile. *Id.* at 32-33. Based on their observations, the troopers decided to apply for a search warrant and to ultimately remove the animals from the farm.

PSP Corporal Nicholas Stolar prepared the warrant and sought to search Mr. Havican's entire property, including "any and all curtilage, vehicles and outbuildings associated with and/or attached to the property…." Mr. Havican's Omnibus Pre-Trial Motion, 9/1/23, Exhibit B at 1 (First Warrant Application). Items to be searched for and seized included

> [a]ny and all evidence of the crime of animal cruelty and/or the crime of neglect of animal[s]. Photographs and/or video recording to be taken of the property, buildings, kennels, pens and/or any part of the property that has evidence pertaining to the prior mentioned crimes of animal cruelty and/or the crime of neglect of animal[s]. Any and all animals deemed to be neglected by animal cruelty officers present at the scene.

*Id.* This warrant was approved by Magisterial District Judge Brian McGowan on October 8, 2022.

After conducting this search, a second warrant was obtained for sales receipts, inventory lists, veterinary records, and other documentation for Mr. Havican's business related to the animals on his farm.[1] During the execution of this second warrant, troopers found what they considered to be large sums

---

[1] This warrant is not challenged in this appeal.

of cash in the residence as well as certain information which indicated to the troopers both that Mr. Havican was currently collecting welfare benefits, and that he had regularly engaged in cash-based sales of his animals. Later that same day, PSP Trooper Kylene Cotton sought a third search warrant for the Havican property. This warrant sought to seize the proceeds of unlawful activity conducted at the residence, including any currency, as well as mail related to receiving welfare benefits. This warrant was approved by Magisterial District Judge Denise Buell on October 27, 2022, and permitted a search of the entire Havican property.

Mr. Havican was ultimately charged with 79 counts of aggravated cruelty to animals (F3) (18 Pa.C.S. § 5534(a)(2)), 19 counts of neglect of animals — causing bodily injury or placing the animal at risk of serious bodily injury (M3) (18 Pa.C.S. § 5532(a)(3)), and 65 counts of neglect of animals (S) (18 Pa.C.S. § 5532) stemming from his care of the puppies, chickens, pigs, goats, ducks, and pigeons found at his property. Following his preliminary hearing, several charges were dismissed, and Mr. Havican was bound over on 75 felony counts, 12 misdemeanor counts, and 65 summary offenses.

Mr. Havican filed a timely omnibus pre-trial motion on September 1, 2023, seeking suppression of the evidence received pursuant to the first and third search warrants listed above due to material misrepresentations in the affidavits, as well as a lack of probable cause. The court conducted a hearing, and then granted the motion to suppress on February 13, 2024. The Commonwealth filed a request for reconsideration, which the suppression

court denied on March 1, 2024. The Commonwealth then filed a timely appeal, certifying that the order of February 13, 2024, would terminate or substantially handicap the prosecution.[2] Both the Commonwealth and the suppression court have complied with Pa.R.A.P. 1925.

In this appeal, the Commonwealth presents the following issues for our consideration:

> (1) Did the search warrants associated with this case, specifically the search warrant issued October 8, 2022 (first warrant) and the search warrant issued October 27, 2022 (third warrant)[,] set forth probable cause where the first warrant describes extreme neglect including deplorable conditions, and deceased puppies, one of which was being eaten, and where the third search warrant details large amounts of cash as well as mail documentation showing that [Mr. Havican] was receiving welfare benefits?
>
> (2) Should evidence be suppressed when a search is done and evidence is obtained pursuant to [the] valid and independent consent of [Mr. Havican] and that consent was never challenged by [Mr. Havican], even when a court finds that a contemporaneous search warrant lacks probable cause?

Brief for Commonwealth at 4.

**First Issue**

---

[2] It is well-settled that when a motion to suppress is granted and the Commonwealth asserts in good faith that suppression substantially handicaps or effectively terminates the prosecution for lack of evidence, the Commonwealth has the right to appeal the suppression order. ***Commonwealth v. Murphy***, 916 A.2d 679, 680 (Pa. Super. 2007); ***see also*** Pa.R.A.P. 311(d).

We apply the following standard of review when the Commonwealth has filed an appeal from the grant of a motion to suppress:

> When reviewing the grant of a motion to suppress, we consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. We are bound by the factual findings of the suppression court that are supported by the record. We review the legal conclusions *de novo*.

*Commonwealth v. Adorno*, 291 A.3d 412, 415 (Pa. Super. 2023) (internal citations and quotation marks omitted).

Pursuant to the Fourth Amendment, all citizens possess a right to be free from unreasonable searches and seizures. U.S. CONST. Amend IV. Pertinent to the case at bar, the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.*[3] There is a strong preference for searches to be conducted pursuant to a search warrant. *Commonwealth v. Leed*, 186 A.3d 405, 412 (Pa. 2018).

Importantly, however, "[t]he issuing authority, in determining whether probable cause has been established, may not consider any evidence outside

---

[3] Article 1, Section 8 of the Pennsylvania Constitution similarly provides protection from unreasonable searches and seizures, and requires that warrants to search shall only issue after a showing of probable cause. Our courts have consistently noted that the Pennsylvania Constitution is meant to embody a strong protection of our citizens' right to privacy. *See, e.g.*, *Commonwealth v. Torres*, 177 A.3d 263, 274 (Pa. Super. 2017) ("[T]he right of privacy espoused in Article 1, Section 8 arose in part to keep citizens free from searches based upon generalized suspicions.").

the affidavits." *Id.* (citing Pa.R.Crim.P. 203(B)). In other words, the four corners of the affidavit attached to the search warrant application must provide the reviewing magistrate with a sufficient basis for a finding of probable cause. *Id.* Moreover, probable cause is only established "where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." *Id.* Once a search warrant is challenged, the Commonwealth bears the burden of establishing that the magistrate had a substantial basis for concluding that probable cause existed. *Id.* When evaluating whether probable cause has been established, we consider the totality of the circumstances. *Adorno*, 291 A.3d at 415-16.

*First Warrant*

The Commonwealth alleges error in the court's finding that the first and third search warrants were not supported by probable cause. We thus begin by examining the affidavit of probable cause attached to the first warrant. The pertinent part of Corporal Stolar's affidavit of probable cause attached to the warrant application reads as follows:

> On 10/08/2022, members of the Pennsylvania State Police were shown a video depicting alive and deceased animals living in deplorable conditions at the residence of 7671 Edinboro Road, Summit Township, Erie County. It was related that the animals at that location were under the care of Gregory Havican. This video was taken by Benjamin Carrier, … who had access to the location because he had been hired by Gregory Havican to assist with the care of these animals. … Benjamin Carrier … related that he had been hired in September of 2022 to assist with the care

- 6 -

for the animals located at 7671 Edinboro Road, Summit Township, Erie County by Gregory Havican. He related that he took 2 weeks off work from 09/16/2022 until 10/03/2022. At the time he returned to work on 10/03/2022, he found 1 deceased puppy. He related that Gregory Havican advised him to dispose of the animal by placing it on a burn pile located on the property. On 10/05/2022, he advised he returned to the property and found that the kennels were in no better shape and there were now 2 more deceased puppies that were starting to be eaten by the other puppies in the same kennel. Upon discovering this, Benjamin Carrier decided to videotape the living conditions of the animals in the kennel located in the barn on the property.

After viewing video footage and interviewing Benjamin Carrier, troopers went to the location, … and spoke with Gregory Havican, regarding the report of animals being mistreated on his property. Gregory Havican gave troopers written consent to search the barn and kennels on the property to check the welfare of the animals. He also later granted verbal consent to search the property along paths leading from the barn and kennels to search for any burn piles that may or may not contain any deceased puppies.

After receiving this consent, troopers discovered a deceased puppy on top of a burn pile along a path from the barn, as Benjamin Carrier related there would be, [and] also in that same pile, other remains of at least 2 dogs were located.

Your affiant is requesting nighttime hours search warrant as this crime involves living animals that need immediate attention and evidence of crimes committed could be disposed of or tampered with if not seized.

First Warrant Application at 2 (unnecessary capitalization omitted).

Preliminarily, we stress that while probable cause affidavits must be read in a commonsense fashion, the reviewing court may not "engage in speculation or conjecture, as the burden rests entirely upon the Commonwealth" to establish probable cause. *Leed*, 186 A.3d at 416. Moreover, "[w]e expect law enforcement to be specific when presenting

- 7 -

affidavits to issuing magistrates, especially since the Rules of Criminal Procedure require certain levels of specificity." *Id.* at 418.

Thus, in summary, the affidavit in question alleges that officers saw a video that showed animals living in "deplorable" conditions at Mr. Havican's farm; the video also showed dead animals, including a dead puppy that was discovered and placed on a burn pile by Mr. Carrier on October 3, 2022; on October 5, 2022, Mr. Carrier found more dead puppies and alleged that they were "starting to be eaten" by other puppies in the kennel; and officers found the body of a dead puppy on the burn pile along with the remains of at least two other dogs. A nighttime warrant was sought because the remaining animals "need[ed] immediate attention." *See generally* First Warrant Application at 2.

More detail was provided at the suppression hearing. To counter claims made by defense counsel that the affidavit contained misleading information or misrepresentations, Corporal Stolar testified that police were concerned that animals at Mr. Havican's farm were in need of medical attention after viewing Mr. Carrier's video. N.T. at 9. Specifically, according to the affidavit, dead puppies were found by Mr. Carrier on October 3, 2022, and October 5, 2022. The Commonwealth maintained that Mr. Carrier's video, which was shown to the suppression court, depicted the headless corpse of a puppy. *Id.*

at 17. After showing the video to the court,[4] the defense asserted that the video was unclear and argued that the officer "can't tell anybody by looking in the video that that's a deceased animal, if that's an animal at all. You can't. That's why you need the person here to authenticate." *Id.* Mr. Carrier, who shot the video, was not a witness at the suppression hearing. After arguing about what the video depicted, the Commonwealth asked for a continuance to bring Mr. Carrier in to testify, but the suppression court denied the request. *Id.* at 18-20.[5]

Corporal Stolar was also asked about how many dead puppies were found at the Havican farm. The video allegedly showed one dead animal, but it was not there when the corporal arrived at the farm. *Id.* at 37 (Corporal Stolar agreeing that he did not see any dead animals when he arrived at the Havican farm). The affidavit alleges that the corporal saw a dead puppy sitting atop a burn pit in the rear of the property, and that the remains of at least two dogs were located there as well. At the suppression hearing, however, Corporal Stolar admitted that he observed, in addition to one dead puppy on the burn pit, various bone remains — which may or may not have been canine bones. *Id.* at 45. In fact, the corporal admitted that the bone remains could have been consistent with other animals such as a fox, a coyote, or even a

---

[4] Partly because Mr. Carrier was not present at the hearing, the suppression court ordered that no audio to the recording be played in court due to his excited and profanity-laden narration.

[5] The suppression court admitted the preliminary hearing testimony of Mr. Carrier into evidence over defense objection. N.T. at 32.

baby lamb; they were not necessarily proof that dogs on the farm were being abused and killed. *Id.* at 50-51.

Mr. Havican also objected to the use of the word "deplorable" in the affidavit, claiming that the Commonwealth failed to specify what was meant by that word within the warrant's four corners. When asked about this at the suppression hearing, Corporal Stolar stated that he finds the words "dirty" and "deplorable" in this context to be interchangeable, and he found the barn where the puppies were located to be dirty and appeared "to not [have] be[en] cleaned for a while." *Id.* at 61, 64. Defense counsel argued strenuously that using the loaded term "deplorable" — when what was seen was merely "dirty" conditions — gave the reviewing magistrate an inaccurate depiction of what was found at the Havican farm. *Id.* at 65-67.

In granting suppression, the court found that the statements in this first warrant application failed to establish that Mr. Havican was engaged in criminal activity. Suppression Court Opinion (SCO), 2/13/24, at 10 (unnumbered). The court explained:

> The simple sight of a deceased animal, by itself, without more, cannot be extended to mean there was criminal abuse or neglect when under the care of [Mr. Havican] or anyone else, including Mr. Carrier, the individual hired to care for the animals. It is not clear what legal import [Corporal] Stolar means with the adjective "deplorable." Even accepting the Commonwealth's contention that the use of the term "deplorable" was not a material misrepresentation and that it has dictionary definitions of "deserving of censure or contempt"; "wretched"; or "lamentable"; those are still conclusory definitions that do not describe with sufficiency the requisite facts necessary to establish that probable cause exists. The statement that "puppies were starting to be eaten" lacks factual specificity and context relative to how and

- 10 -

when such event occurred and whether [Mr. Havican was] aware of any such circumstance. The mere finding of a "deceased puppy on top of a burn pile" or the remains of other dogs or their bones on a burn pile or pit refers to no criminal activity, especially when considering that incineration is the appropriate method for the disposition of the deceased animals according to Pennsylvania law.[6]

Significantly, the Affidavit of Probable Cause includes no information concerning an inquiry as to how long [Mr. Havican] owned the animals, nor anything about what veterinary care and medications the animals were receiving. This [c]ourt is not stating that any omissions were deliberate, but allegations in the Affidavit for the October 8, 2022 Search Warrant are insufficient to withstand [Mr. Havican's] Motion to Suppress.

*Id.* at 10-11 (unnumbered).

We agree with the suppression court that the affidavit signed by Corporal Stolar lacks sufficient indicia of probable cause that Mr. Havican had committed the crimes of aggravated animal cruelty or animal neglect. Perhaps most problematically, there are no dates or time stamps on the video; thus, nothing in the record verifies when the video was taken. N.T. at 14. As the suppression court noted, "What if this video was taken 10 years ago?" *Id.* at 15. Mr. Carrier, who shot the video, did not testify at the hearing. Thus, there is no independent verification that the video was an accurate reflection of the conditions at the Havican farm in early October of 2022.

Moreover, we agree with the defense that the use of "deplorable" to describe the conditions at the kennel is insufficient to establish probable cause. The offense of "neglect of animal" requires proof that the person failed to provide for the basic needs of an animal for which he has the duty of care,

---

[6] *See* 3 Pa.C.S. § 2352 (Disposal of dead domestic animals).

including the lack of food and drinkable water, access to clean and sanitary shelter from the elements, and veterinary services. 18 Pa.C.S. § 5532.[7] While the video depicted dirty conditions in the kennel, there is no information contained in the four corners of the affidavit regarding the animals' lack of access to adequate food and potable water. Further, while Corporal Stolar suggested that he meant the word "deplorable" to mean the equivalent of dirty, N.T. at 61, the reference to dogs living in dirty kennels is inadequate to establish ongoing criminal conduct. No facts in the affidavit refer to the animals' apparent lack of access to food or water, or how feces and urine allegedly permeated the kennels. Absolutely nothing referred to animals being ill or in need of veterinary care. Combine this with the lack of any time-frame noted for the video taken by Mr. Carrier, and we must agree with the suppression court that, under these facts, probable cause is lacking. Accordingly, the suppression court's factual findings are supported by the record, and there was no error in suppressing the evidence found pursuant to the first warrant.

*Third Warrant*

The Commonwealth further argues that the court erred in suppressing the evidence obtained pursuant to the third warrant, dated October 27, 2022. The affidavit of probable cause to the third warrant request stated, in pertinent

---

[7] We note that the charges filed against Mr. Havican specified the subsection related to animals not having adequate veterinary care, 18 Pa.C.S. § 5532(a)(3).

part:

> While on the scene, members located invoices believed to be written by Gregory Havican for the selling of puppies and live[stock] to consumers. A large number of invoices contained language that would indicate that Gregory Havican received cash from those transactions. Based off [of] the fact that documentation was located in Gregory Havican's residence that he received government welfare and assistance, it is believed that the majority of these cash[-]based transactions have not been reported to the State and Federal government as is required reporting for taxable income purposes. There were also bank statements showing that Gregory Havican possessed over 200 thousand dollars in one bank account.
>
> Based off [of] my training and experience, it is known that business owners must pay taxes when they list and sell items in a retail or farm setting. Many business owners try to evade the paying of taxes by avoiding reporting transaction requirements under State and Federal law. With the large sum of money observed in Gregory Havican's bedroom and office space as well as the fact that [Gregory] Havican receives government welfare and assistance[,] it is believed that [Gregory] Havican is failing to pay all necessary taxes by conducting a large number of his transactions by receiving the payments in cash.

Mr. Havican's Omnibus Pre-Trial Motion at Exhibit D at 2-3 (Third Warrant Application) (unnecessary capitalization omitted).

Examining the facts alleged in this affidavit, we note the specific averments contained therein: authorities found invoices at the Havican farm which indicated that animals were being sold for cash; authorities also found evidence that suggested that Mr. Havican received government assistance; and Mr. Havican had $200,000 in a bank account. At the suppression hearing, Trooper Kylene Cotton explained that, pursuant to the second search warrant approved in this case, authorities had obtained bank records for Mr. Havican

and came across a large amount of 'bulk currency,' defined as a large amount of U.S. currency in multiple different denominations, *i.e.*, one-, five-, ten-, twenty-, fifty-, and hundred-dollar bills. N.T. at 78-79. Specifically, in a desk drawer from a bedroom in Mr. Havican's trailer, Trooper Cotton observed cash which she estimated to have a value of $250,000 dollars. *Id.* at 82. The trooper also took note of correspondence from the Department of Labor and Industries, addressed to Mr. Havican, which she stated was "consistent with welfare benefits." *Id.* at 83.

Trooper Cotton admitted, however, that the desk in which she found the money was in a bedroom that did not appear to be Mr. Havican's primary bedroom, and she did not know if his son, for example, used this spare bedroom, as she did not talk to the son. *Id.* at 89. The Commonwealth stipulated that the affidavit did not state that Mr. Havican was the only one that accessed this spare bedroom. *Id.* at 90. Moreover, other people who lived on the farm were present at the time of this search, yet Trooper Cotton did not ask if the money belonged to any of these people. *Id.* at 92. Instead, she inferred that the money belonged to Mr. Havican. *Id.* at 93.

Moreover, with respect to the stated documentation that Mr. Havican received welfare benefits, Trooper Cotton did not identify the documents she observed or what they stated. *Id.* at 96. The only indication within the four corners of the affidavit is that letters were sent from the Department of Labor and Industry. Trooper Cotton admitted that there was nothing in the affidavit that substantiated a claim that Mr. Havican did not pay income taxes, and she

- 14 -

did not investigate his tax returns before authoring the affidavit of probable cause. *Id.* at 101, 112-13.

The suppression court addressed the lack of probable cause present in the third warrant as follows:

> Trooper Cotton[] assert[ed] that PSP members found invoices indicating that [Mr. Havican] received cash from the sale of animals; that documentation was found indicating [Mr. Havican] received welfare benefits; and [that she] also found bank statements indicating [Mr. Havican] had a large sum deposited[. N]one of those statements taken by themselves, or taken under the "totality of circumstances" test, are sufficient to find that probable cause exists for the issuance of a warrant.

> The trooper made the allegation, based off [of] her "training and experience," that business owners, such as [Mr. Havican], try to evade paying state and federal taxes. This assertion is mere speculation at best and is lacking in any evidence whatsoever that [Mr. Havican] was criminally involved in failing to pay taxes or engaged in any type of welfare fraud. Though the trooper may have filed for the Search Warrant in good faith, the Affidavit of Probable Cause is simply devoid of reliable information and is insufficient to form a basis of potential wrongdoing. Suppression must be granted.

SCO at 11 (unnumbered). We agree.

As noted earlier, while suppression courts will review probable cause affidavits in a commonsense fashion, "this does not permit [the] court to engage in speculation or conjecture." *Leed*, 186 A.3d at 416. The speculation in this affidavit is readily apparent. While Trooper Cotton stated that Mr. Havican was receiving welfare benefits, this conclusory statement is not further explained. At the suppression hearing, Trooper Cotton stated that she concluded that Mr. Havican was receiving welfare benefits because she saw "letters that were addressed to Mr. Gregory Havican from [the] Department

- 15 -

of Labor and Industries, which is consistent with welfare benefits." N.T. at 83. Assuming that the Department of Labor and Industries handles a variety of tasks that would involve mailing documents to citizens, this is hardly proof of the receipt of welfare benefits.

The affidavit further opines that "it is believed that the majority of these cash transactions have not been reported to the State and Federal government as is required reporting for taxable income purposes." Third Warrant Application, *supra*. This assertion is wholly speculative. Also suspicious to Trooper Cotton was the fact that Mr. Havican had $200,000.00 in one bank account. *Id.* Yet, without more information, the fact that this amount of money was in the bank means nothing with respect to whether criminality had been involved. Mr. Havican could have received a large inheritance, or won the lottery, or had other employment of which Trooper Cotton was unaware. A large bank account, by itself, is not evidence of any crime. Trooper Cotton further surmised that business owners try to evade paying taxes, and since Mr. Havican was receiving welfare, it was likely that he failed to pay taxes on cash income he had received by selling animals. Again, this supposition is made up of whole cloth.

After review, we are compelled to agree with the suppression court's conclusion that the affidavit attached to the third search warrant provides only generalized statements about how some business owners sometimes act. This speculation does not establish a likelihood that Mr. Havican was engaged in a criminal enterprise. Accordingly, any evidence seized pursuant to the invalid

warrant was properly suppressed. *See, e.g.*, *Commonwealth v. Jacoby*, 170 A.3d 1065, 1083 (Pa. 2017) (finding no probable cause was established in the warrant application when the officer asserted that a murder weapon would be found at the defendant's home 15 months *after* the murder occurred, because the defendant was a felon, not permitted to lawfully own a firearm, and would likely have retained the weapon because it would be difficult to replace; the inference of unlawful possession was found to be wholly speculative). The court did not err in concluding that probable cause was lacking here.

### Second Issue

In the second issue raised in this appeal, the Commonwealth asserts that even if the search warrants were defective, Mr. Havican had granted officers permission to search, both orally and in writing, which negates the need for a warrant.[8] It is well-settled that a valid exception to the warrant requirement exists when law enforcement searches an area with consent. *Commonwealth v. Lehnerd*, 273 A.3d 586, 590 (Pa. Super. 2022). Moreover, consent to search will be deemed voluntarily given when it is the product of a free and unrestrained choice, and not the result of duress or coercion, express or implied, or a will overborne. *Commonwealth v. Strickler*, 757 A.2d 884, 901 (Pa. 2000).

The Commonwealth argues that *Commonwealth v. Bagley*, 596 A.2d

---

[8] Despite the Commonwealth's inclusion of this issue in its Pa.R.A.P. 1925(b) statement of errors, the suppression court did not address this claim.

811 (Pa. Super. 1991), mandates that suppression is not required despite any deficiencies in a warrant application when a criminal defendant provides voluntary consent to search prior to the issuance of a warrant. We thus closely examine that case.

In **Bagley**, Bagley arrived in a hospital emergency room on Easter Sunday carrying the dead body of his wife, claiming that his wife electrocuted herself when an electric appliance accidentally fell into the tub where she was bathing. **Id.** at 813. Hospital personnel overheard Bagley state that he had torn apart the bathroom where this occurred and that he was considering burning down his home. **Id.** Bagley also told hospital workers not to report his wife's death to police. **Id.** Finding these circumstances to be suspicious, and noting that the dead wife had a cut above her right eye and unexplained bruises, a nurse called police. **Id.**

Officers recited the above information in the application for a search warrant for Bagley's home. **Id.** at 813-814. In considering a motion to suppress, the suppression court found that the warrant was invalid because the application did not particularly describe any crime allegedly having been committed; it merely listed nonspecific suspicious facts surrounding the wife's death. **Id.** at 815. This Court agreed, noting that "the primary purpose for the search warrant was not to search for specific evidence of a crime which had been committed, but merely to allow police to conduct a general investigation to determine whether [the wife's] death might have been criminal." **Id.** Thus, the affidavit was not supported by probable cause.

The Commonwealth argued that suppression should have been denied because Bagley had also voluntarily consented to a search of his property before the search warrant application was obtained. *Id.* at 816. Yet, the suppression court had found that Bagley's consent to search had not been given voluntarily, because it was given after police informed him that they were in the process of obtaining a search warrant, which was indicia of coercion. *Id.* at 817-18. However, this Court reversed that decision, noting that the mere fact that officers state that they have a warrant, or are obtaining a warrant, does not require suppression; rather, an inquiry remained as to the voluntariness of that consent. *Id.* at 818.

Upon considering the totality of the circumstances, this Court recounted that an officer arrived at Bagley's home to take his statement regarding his wife's death before any search occurred and before obtaining a magistrate's approval of a search warrant. *Id.* As Bagley began to explain the circumstances of his wife's death, however, he said that it would be easier to just show the officer what had happened. *Id.* at 819. Bagley then took the officer on a tour of various places in the home and the surrounding area, pointing out certain areas where evidence was found. *Id.* This was critical. As this Court explained:

> The circumstances of Bagley's conversation with [the officer] prior to the arrival of the search warrant belie any suggestion of coercion, either of an express or implied nature. It was [Bagley] who, without a request to do so, insisted upon showing [the officer] around the house so that he could better explain his own exculpatory version of the events leading to his wife's death, specifically pointing out to the detective all of the items of

evidence which were subsequently seized. Although the actual seizure of evidence from [Bagley's] home was not made until after the invalid warrant had arrived, Bagley, by his prior actions in freely showing evidence to [the officer], abandoned any reasonable expectation of privacy which he enjoyed with respect to such property.

*Id.*

In the case at bar, Corporal Stolar testified that, prior to obtaining the warrant, he went to the Havican farm, spoke to Mr. Havican, and "[he] obtained written and verbal consent." N.T. at 8.[9] While specific details about this interaction with Mr. Havican were limited, Corporal Stolar stated:

We originally had a video that was shown to us, as well as speaking to the individual that took the video. The video led us to believe that there were animals that were in need of medical attention.

So[,] we arrived at the residence where Mr. Havican was at, [and] we made contact in the driveway. We explained to him that we wished to make sure that all the animals were in good health that were on his property.

We explained that we had received information showing that some animals … could possibly be in distress[,] that looked like they needed medical attention, and that's when he gave us consent to search the property.

*Id.* at 9. Corporal Stolar further described meeting Mr. Havican:

I met with [Mr.] Havican, who is sitting here[,] in the driveway of the property. Myself, Trooper Westerbeck[,] and I believe Trooper Haney[10] spoke to him and explained our concerns over the well-being of [his] animals. And that's when he gave us written consent to search, search the property and the farm, the property and the barn that he advised where the animals were kept.

---

[9] The certified record does not contain a copy of the consent to search form.

[10] The record does not supply the first names of Troopers Westerbeck or Haney.

*Id.* at 22. In the written form granting consent to search, signed by Mr. Havican, the items to be searched are listed as "dog kennels." *Id.* at 24. Corporal Stolar discussed the search he conducted, as follows:

> So following going through the barn that was – that housed the kennels, the written consent was very specific about what we were asking to search. We then asked Mr. Havican for verbal consent. If there were any burn piles, we asked if he could show us where the burn piles might be kept on the property.
>
> He walked us to one that was behind — I don't know the — the one path that went directly behind. There was [*sic*] no remains there. I had went [*sic*] back to the barn and said, hey, there are other paths around here, are we allowed to go down those paths to search as well and he said yes. … And then I went down another path. And that is where I found the burn pile with the remains of several dead dogs.

*Id.* at 32-33.

We agree with the Commonwealth that the testimony of Corporal Stolar establishes that Mr. Havican consented to the search of the kennels and the paths behind the kennels. Mr. Havican admitted as much at the suppression hearing. *Id.* at 24-25 (defense counsel stating: "Judge, just for expediency, I'm not challenging … his consent to that."). Thus, Corporal Stolar had proper authority to be on the property pursuant to Mr. Havican's consent.

However, the corporal did not testify about anything that he observed at the farm after obtaining consent that constituted evidence of criminal activity. The corporal testified that he saw dirty conditions in the kennels and a dead puppy and other bone remains on top of the burn pit. He did not see a dead dog being eaten, as alleged to have been on the video. He also did not discuss or address the health needs of the other animals remaining at the

farm. As noted, having a fire pit to take care of canine remains is a proper method for disposal, not evidence of criminal activity. Further, having "dirty" conditions in a kennel, without more, does not rise to the level of a criminal offense.

Further, the Commonwealth has not fully explained what evidence, if any, was seized pursuant to this consent search, or how the plain view doctrine applies to the warrantless seizure of any items from this search. *See, e.g.*, *Commonwealth v. Saunders*, 326 A.3d 888, 897 (Pa. 2024) (explaining that the plain view doctrine permits police to effectuate a warrantless seizure of an item if: (1) the police view the item from a lawful vantage point; (2) the incriminating nature of the item is immediately apparent; and (3) the police have a lawful right of access to the item). Under these facts, police may have had a lawful vantage point and right of access to items in the kennels at the time of the consent search, but no testimony established that items of an immediately apparent incriminating nature were found. The Commonwealth also fails to argue that Mr. Havican's consent to search the property on that date constituted consent to search his property on the subsequent dates when the officers executed the invalid warrants. Therefore, we conclude that Mr. Havican's initial consent to the search of his kennels does not change our analysis regarding the lack of probable cause to seize Mr. Havican's property. Finding no merit to either of the Commonwealth's issues, we affirm the order that granted suppression in this matter.

Order affirmed.

Judge Lane joins this memorandum.

Judge Olson concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 2/13/2025